UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OCEANIC EXPLORATION COMPANY, a Delaware corporation, 7800 East Dorado Place, Suite 250, Englewood, Colorado 80111; and PETROTIMOR COMPANHIA DE PETROLEOS, S.A.R.L., a corporation organized under the laws of Portugal, 7800 East Dorado Place, Suite 250, Englewood, Colorado 80111,<br><br>                 Plaintiffs,<br><br>v.<br><br>CONOCOPHILLIPS, a Delaware Corporation; CONOCOPHILLIPS COMPANY, a Delaware corporation; TOKYO TIMOR SEA RESOURCES INC., a Delaware corporation; PHILLIPS PETROLEUM COMPANY ZOC, a Delaware corporation; PHILLIPS PETROLEUM COMPANY INDONESIA, a Delaware corporation; PHILLIPS PETROLEUM (96-20), INC., a Delaware corporation; PHILLIPS PETROLEUM PRODUCTION INDONESIA, INC., a Delaware corporation; PHILLIPS INDONESIA, INC., a Delaware corporation; PHILLIPS INTERNATIONAL INVESTMENT, INC., a Delaware corporation, CONOCOPHILLIPS (03-21) PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS (03-12) | Civil Action No. 04 CV 00332 EGS RACKETEERING<br><br>AMENDED COMPLAINT FOR:<br><br>1.  VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;<br>2.  CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;<br>3.  VIOLATION OF THE ROBINSON-PATMAN ACT;<br>4.  VIOLATION OF THE LANHAM ACT;<br>5.  MISAPPROPRIATION OF TRADE SECRETS;<br>6.  INTENTIONAL INTERFERENCE WITH CONTRACT;<br>7.  INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;<br>8.  CONVERSION;<br>9.  UNJUST ENRICHMENT; AND<br>10. UNFAIR COMPETITION |

04163/581331.4

PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS (03-13) PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS (03-19) PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS (03-16) PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS (03-20) PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS AUSTRALIA PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS AUSTRALIA GAS HOLDINGS PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS JPDA PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS PIPELINE AUSTRALIA PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS STL PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS WA-248 PTY. LTD., an Australian private company organized under the laws of the

Commonwealth of Australia; DARWIN
LNG PTY. LTD., an Australian private
company organized under the laws of the
Commonwealth of Australia; TOKYO
TIMOR SEA PTY. LTD., an Australian
private company organized under the laws
of the Commonwealth of Australia;
PHILLIPS PETROLEUM COMPANY
ZOC PTY. LTD., an Australian private
company organized under the laws of the
Commonwealth of Australia; TIMOR
SEA DESIGNATED AUTHORITY FOR
THE JOINT PETROLEUM
DEVELOPMENT AREA, an
unincorporated entity; TIMOR GAP
JOINT AUTHORITY FOR THE ZONE
OF COOPERATION, an entity organized
pursuant to the Timor Gap Treaty, PT
PERTAMINA (PERSERO), a company
organized under the laws of the Republic
of Indonesia; BADAN PELAKSANA
KEGIATAN USAHA HULU MINYAK
DAN GAS BUMI (also known as BP
MIGAS), a company organized under the
laws of the Republic of Indonesia; and
DOES 1 through 50, unknown persons or
entities,

        Defendants.

## AMENDED COMPLAINT

Plaintiffs Oceanic Exploration Company and Petrotimor Companhia de Petroleos, S.A.R.L. (collectively "Plaintiffs") bring this action to redress the harm caused by defendants' theft, misappropriation and conversion of oil and natural gas resources within Plaintiffs' 14.8 million acre concession area in the Timor Sea.  This wrongful and actionable conduct by defendants was part of a deliberate scheme to gain control of and exploit Plaintiffs' oil and natural gas in the Timor Sea, property itself worth an estimated US$50 billion.

This complaint will detail the misconduct of the defendants.  For the Court's reference and convenience, the Complaint is divided into the following sections:

## TABLE OF CONTENTS

**Page**

I.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.   NATURE OF THE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.  PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.    Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.    The ConocoPhillips Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      C.    The ConocoPhillips Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      D.    The Joint Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      E.    The Designated Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      F.    The Pertamina Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      G.    Doe Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.   FACTUAL BACKGROUND AND COMMON ALLEGATIONS . . . . . . . . . . . 16

      A.    Oceanic and Petrotimor Obtain the Timor Sea Energy Concession . . . . . 16

      B.    Australia's Desire for the Oil in the Timor Sea Resulted in its
            Blessing of Indonesia's Invasion and Forcible Annexation of East
            Timor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      C.    ConocoPhillips' 40-Year Involvement in Suharto's Indonesia, One of
            the Most Corrupt Regimes in the World . . . . . . . . . . . . . . . . . . . . . . . . 35

            1.    ConocoPhillips Effectively Help Fund The Invasion of East
                  Timor Through its Illegal Payments to Pertamina Officials . . . . . . 37

## TABLE OF CONTENTS
### (continued)

Page

2.   ConocoPhillips Paid a Bribe or Kickback to Pertamina Through the Purchase of a Purported Joint Venture Interest with a Shell Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

3.   ConocoPhillips' Deals With Pertamina Allowed it to Commit Tax Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

D.   The Joint Authority Gains Control Over Oil and Natural Gas Reserves in the Timor Sea and Makes ConocoPhillips the Largest Contractor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

E.   The Expulsion of Indonesia from East Timor and Australia's and ConocoPhillip's Successful Efforts to Switch Sides . . . . . . . . . . . . . . . . 52

F.   Australia Pressures East Timor to Relinquish its Oil Rights and ConocoPhillips Bribes Prime Minister Alkatiri . . . . . . . . . . . . . . . . . . . . 59

FIRST CLAIM
RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

(a)   Interstate and Foreign Travel in Aid of Racketeering Enterprises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

(b)   Interstate or Foreign Transportation of Stolen Goods . . . . . . . . . . 84

(c)   Receipt of Stolen Goods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

(e)   Money Laundering - Transportation . . . . . . . . . . . . . . . . . . . . . . . 85

(f)   Monetary Transactions in Proceeds from Specified Unlawful Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

(h)   Embezzlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

# TABLE OF CONTENTS
**(continued)**

**Page**

SECOND CLAIM
CONSPIRACY TO VIOLATE RACKETEER INFLUENCED
AND CORRUPT ORGANIZATIONS ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

THIRD CLAIM
VIOLATION OF THE ROBINSON-PATMAN ACT . . . . . . . . . . . . . . . . . . . . 92

FOURTH CLAIM
VIOLATION OF THE LANHAM ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

FIFTH CLAIM
MISAPPROPRIATION OF TRADE SECRETS . . . . . . . . . . . . . . . . . . . . . . . 96

SIXTH CLAIM
INTENTIONAL INTERFERENCE WITH CONTRACT . . . . . . . . . . . . . . . . . 98

SEVENTH CLAIM
INTENTIONAL INTERFERENCE WITH
PROSPECTIVE ECONOMIC ADVANTAGE . . . . . . . . . . . . . . . . . . . . . . . . 99

EIGHTH CLAIM
CONVERSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

NINTH CLAIM
UNJUST ENRICHMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

TENTH CLAIM
UNFAIR COMPETITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

## I.   <u>JURISDICTION AND VENUE</u>

1.     The Court has jurisdiction over this action pursuant to 28 U.S.C.

§§ 1330, 1331, 1337, 1338; 18 U.S.C. §§ 1964(c), 1956; 15 U.S.C. §§ 15, 1121 and

supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

2.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(d),

(f), 1400(a); 18 U.S.C. § 1965; and 15 U.S.C. § 15.

## II.   <u>NATURE OF THE ACTION</u>

3.     This lawsuit is about the theft of one of the world's major

hydrocarbon reserves, the oil and natural gas fields lying off the southern coast of East

Timor.  These are major, world-class reserves valued at over US$50 billion.  The

defendants' efforts take place over a thirty-year period as Australia, Indonesia and

ConocoPhillips, with varying efforts at different times, stole Plaintiffs' oil and natural gas

rights granted by Portugal, on behalf of its East Timor province.  Portuguese sovereignty

over East Timor was recognized by the United Nations until the establishment of a United

Nations Transitional Administration in 1999, prior to East Timor's independence in 2002.

4.     Certain politicians in Australia, since at least the late 1960's, coveted

the Timor Sea oil and natural gas fields.  They first sought unsuccessfully to negotiate

with Portugal to stake out a claim, but Portugal was unyielding in protecting the interests

of East Timor.  The Australians then became aware that Indonesia, led by the notoriously

corrupt President Suharto, was planning to invade and annex East Timor. Australia,

seeing an opportunity to negotiate more favorably with Indonesia at the expense of East

Timor, remained publicly silent, but, behind the scenes, encouraged Indonesia to seize

East Timor.

5. The ensuing Indonesian invasion shocked the world and resulted in

mass murder. One-third of the population of East Timor was killed and Indonesia

established a ruthless and tyrannical regime. Australia, the lone country to do so,

recognized Indonesia's invasion of and forceable annexation of East Timor, turning a

blind eye to the massive human suffering that resulted.

6. As a reward, Australia then entered into an agreement with Indonesia

to exploit commercially the Timor Sea oil and natural gas fields, establishing a

commercial entity to direct, develop and manage the production of oil and gas and its

sale. ConocoPhillips, an American oil company that had not been previously involved in

any of the Timor Sea exploratory efforts, was selected to participate in this exploitation.

7. ConocoPhillips had been paying bribes to Suharto and his cronies for

at least twenty years. The company made these payments to secure and maintain its

position as the largest oil and gas field leaseholder in Indonesia. As a result of these

payoffs, Indonesia gave ConocoPhillips Timor Sea exploration data stolen from Oceanic

and Petrotimor during Indonesia's invasion of East Timor. ConocoPhillips used this data

to secure the lion's share of exploitation rights for the most promising of the geographical blocks in the Timor Sea.

8.     Thereafter, as a direct result of the world community's condemnation of the Indonesian occupation and Suharto corruption, Indonesian occupation forces withdrew from East Timor and it was allowed to become an independent state.  East Timor is the poorest nation in southeast Asia.  The oil and natural gas located in the Timor Sea are, without question, the most significant natural resource in the area. Australia reversed course in its support of Indonesia and began to pressure the newly-formed nation to ratify the development decisions made by Australia and Indonesia in the Timor Sea.  ConocoPhillips joined in pressuring East Timor, promising Australia that it would invest US$1.5 billion in constructing a liquid natural gas processing plant in the northern Australian city of Darwin if its interests in the Timor Sea were confirmed. ConocoPhillips also began to pay regular and substantial bribes to the Prime Minister of East Timor, Mari Alkatiri, and to others.  As a direct result of the bribes, ConocoPhillips secured confirmation of its interests in the Timor Sea and Alkatiri reduced the tax rate imposed upon ConocoPhillips.  Those bribes, over several years, amounted to more than US$2.5 million, or over 500 times Alkatiri's yearly official salary.

9.     Prime Minister Alkatiri entered into an arrangement with Australia to create a non-governmental, commercial entity to exploit and market Timor Sea hydrocarbons similar to the entity previously formed by Australia and Indonesia.  This

Designated Authority confirmed ConocoPhillips as the single-largest private company to participate in development of the Timor Sea resources.  Even though Australia previously split the spoils under a portion of the Timor Sea with Indonesia on a 50-50 basis, it pressured East Timor to accept, in effect, only 30% of the proceeds of the entire Timor Sea, with 70% going to Australia.  Australia conditioned its offer of foreign aid and threatened to stop all oil payments if East Timor did not accede.

        10.    Oceanic and Petrotimor have consistently pressed their entitlement to the Timor Sea concession granted by Portugal.  The East Timor Prime Minister refused to listen to any suggestion that the Plaintiffs' concession be recognized or that ConocoPhillips' interests should be displaced.  Australia, upon learning that Oceanic had offered to fund an East Timor litigation at the International Court of Justice to pursue East Timor's seabed rights, withdrew maritime boundary disputes from its charter to abide by that court's jurisdiction.  ConocoPhillips has begun extracting Plaintiffs' oil from the Timor Sea.  ConocoPhillips has imported that oil into the United States.  ConocoPhillips at that time publically announced that it anticipated extracting natural gas from the Timor Sea and importing it into the United States.

        11.    Oceanic and Petrotimor here seek to be compensated for the wrongful deprivation of their rights in the oil and natural gas fields in the Timor Sea.  The companies' actual damage is in excess of US$10.5 billion.

### III.   PARTIES

#### A.   Plaintiffs

12.     Plaintiff Oceanic Exploration Company ("Oceanic") is a corporation organized under the laws of the State of Delaware with a principal place of business in Englewood, Colorado.

13.     Plaintiff Petrotimor Companhia de Petroleos, S.A.R.L ("Petrotimor") is a corporation organized under the laws of Portugal.  Oceanic Exploration Company controls Petrotimor and owns at least 1,191 shares out of 1,200 outstanding shares of Petrotimor.

#### B.   The ConocoPhillips Defendants

14.     Defendant ConocoPhillips, formerly identified as ConocoPhillips, Inc. in the Complaint, is a corporation organized under the laws of the State of Delaware with a principal place of business in Houston, Texas.  ConocoPhillips is the successor in interest to both Phillips Petroleum Company and Conoco, Inc.  The merger of the two companies took place in 2002.

15.     Defendant ConcoPhillips Company is a corporation organized under the laws of the State of Delaware.

16.     Defendant Tokyo Timor Sea Resources, Inc., formerly known as Phillips Petroleum Timor Sea, Inc., is a corporation organized under the laws of the State of Delaware.

17.     Defendant Phillips Petroleum Company ZOC is a corporation organized under the laws of the State of Delaware.

18.     Defendant Phillips Petroleum Company Indonesia is a corporation organized under the laws of the State of Delaware.

19.     Defendant Phillips Petroleum (96-20), Inc. is a corporation organized under the laws of the State of Delaware.

20.     Defendant Phillips Petroleum Production Indonesia, Inc. is a corporation organized under the laws of the State of Delaware.

21.     Defendant Phillips Indonesia, Inc. is a corporation organized under the laws of the State of Delaware.

22.     Defendant Phillips International Investments, Inc. is a corporation organized under the laws of the State of Delaware.

23.     Defendant ConocoPhillips (03-21) Pty. Ltd., formerly known as ConocoPhillips (00-21) Pty. Ltd., is an Australian private company organized under the laws of the Commonwealth of Australia.

24.     Defendant ConocoPhillips (03-12) Pty. Ltd., formerly known as ConocoPhillips (91-12) Pty. Ltd., is an Australian private company organized under the laws of the Commonwealth of Australia.

25.    Defendant ConocoPhillips (03-13) Pty. Ltd., formerly known as ConocoPhillips (91-13) Pty. Ltd., is an Australian private company organized under the laws of the Commonwealth of Australia.

26.    Defendant ConocoPhillips (03-19) Pty. Ltd., formerly known as ConocoPhillips (95-19) Pty. Ltd., is an Australian private company organized under the laws of the Commonwealth of Australia.

27.    Defendant ConocoPhillips (03-16) Pty. Ltd., formerly known as ConocoPhillips (96-16) Pty. Ltd., is an Australian private company organized under the laws of the Commonwealth of Australia.

28.    Defendant ConocoPhillips (03-20) Pty. Ltd., formerly known as ConocoPhillips (96-20) Pty. Ltd., is an Australian private company organized under the laws of the Commonwealth of Australia.

29.    Defendant ConocoPhillips Australia Pty. Ltd. is an Australian private company organized under the laws of the Commonwealth of Australia.

30.    Defendant ConocoPhillips Australia Gas Holdings Pty. Ltd. is an Australian private company organized under the laws of the Commonwealth of Australia.

31.    Defendant ConocoPhillips JPDA Pty. Ltd. is an Australian private company organized under the laws of the Commonwealth of Australia.

32.    Defendant ConocoPhillips Pipeline Australia Pty. Ltd. is an Australian private company organized under the laws of the Commonwealth of Australia.

33.     Defendant ConocoPhillips STL Pty. Ltd. is an Australian private company organized under the laws of the Commonwealth of Australia.

34.     Defendant ConocoPhillips WA-248 Pty. Ltd. is an Australian private company organized under the laws of the Commonwealth of Australia.

35.     Defendant Darwin LNG Pty. Ltd., formerly known as Phillips Petroleum LNG Pty. Ltd., is an Australian private company organized under the laws of the Commonwealth of Australia.

36.     Defendant Tokyo Timor Sea Pty. Ltd., formerly known as Phillips Petroleum Timor Sea Pty. Ltd., is an Australian private company organized under the laws of the Commonwealth of Australia.

37.     Defendant Phillips Petroleum Company ZOC Pty. Ltd. is an Australian private company organized under the laws of the Commonwealth of Australia.

38.     Collectively, defendants ConocoPhillips; ConocoPhillips Company; Tokyo Timor Sea Resources, Inc.; Phillips Petroleum Company ZOC; Phillips Petroleum Company Indonesia; Phillips Petroleum (03-20), Inc.; Phillips Petroleum Production Indonesia, Inc.; Phillips Indonesia, Inc.; Phillips International Investment, Inc.; ConocoPhillips (03-21) Pty. Ltd.; ConocoPhillips (03-12) Pty. Ltd., ConocoPhillips (03-13) Pty. Ltd.; ConocoPhillips (03-19) Pty. Ltd.; ConocoPhillips (03-16) Pty. Ltd.; ConocoPhillips (03-20) Pty. Ltd.; ConocoPhillips Australia Pty. Ltd.; ConocoPhillips Australia Gas Holdings Pty. Ltd.; ConocoPhillips JPDA Pty. Ltd.; ConocoPhillips

Pipeline Australia Pty. Ltd.; ConocoPhillips STL Pty. Ltd.; ConocoPhillips WA-248 Pty.

Ltd.; Darwin LNG Pty. Ltd.; Tokyo Timor Sea Pty. Ltd.; and Phillips Petroleum

Company ZOC Pty. Ltd. shall be referred to as "ConocoPhillips" or the "ConocoPhillips

defendants."

39.     The ConocoPhillips defendants identified in paragraphs 15 through

38 are subsidiaries of defendant ConocoPhillips.  ConocoPhillips and its subsidiaries are

engaged directly and indirectly in the business of extracting, transporting, refining and

selling oil and natural gas.  ConocoPhillips and its subsidiaries directed, authorized,

participated in or ratified the acts complained of herein by each ConocoPhillips defendant

and were the agent and alter ego of each ConocoPhillips defendant in connection with

said acts.  There exists, and at all times herein there existed, identical or overlapping

directorates, a unity of interest and ownership among and between defendant

ConocoPhillips and its subsidiaries such that any distinction among entities has ceased,

and each ConocoPhillips subsidiary is the alter ego of both ConocoPhillips and its

subsidiaries.  In these circumstances, adherence to the separate corporate existence of

ConocoPhillips and each of its subsidiaries would promote injustice and fraud.

### C.     The ConocoPhillips Group

40.     As used in this Complaint, the ConocoPhillips Group primarily

includes defendants ConocoPhillips; ConocoPhillips Company; Tokyo Timor Sea

Resources, Inc.; Phillips Petroleum Company ZOC; Phillips Petroleum Company

Indonesia; Phillips Petroleum (03-20), Inc.; Phillips Petroleum Production Indonesia, Inc.; Phillips Indonesia, Inc.; Phillips International Investment, Inc.; ConocoPhillips (03-21) Pty. Ltd.; ConocoPhillips (03-12) Pty. Ltd., ConocoPhillips (03-13) Pty. Ltd.; ConocoPhillips (03-19) Pty. Ltd.; ConocoPhillips (03-16) Pty. Ltd.; ConocoPhillips (03-20) Pty. Ltd.; ConocoPhillips Australia Pty. Ltd.; ConocoPhillips Australia Gas Holdings Pty. Ltd.; ConocoPhillips JPDA Pty. Ltd.; ConocoPhillips Pipeline Australia Pty. Ltd.; ConocoPhillips STL Pty. Ltd.; ConocoPhillips WA-248 Pty. Ltd.; Darwin LNG Pty. Ltd.; Tokyo Timor Sea Pty. Ltd.; and Phillips Petroleum Company ZOC Pty. Ltd.

41.     The ConocoPhillips Group also includes a large number of officers, directors, employees and agents of ConocoPhillips or the other ConocoPhillips defendants, some of whom knew of the illegal conduct of the ConocoPhillips Group, including the conduct of and participation in the illegal enterprise; and some of whom carried out the ConocoPhillips Group's illegal activities under the supervision of others in the ConocoPhillips Group, including the conduct of and participation in the conduct of and participation in the illegal enterprise.  These include, but are not limited to, James Mulva, Stephen Brand, Karen Brand, James Godlove and Arthur Bennett.

### D.     The Joint Authority

42.     Defendant Timor Gap Joint Authority for the Zone of Cooperation ("Joint Authority") is the Joint Authority established pursuant to Article 7 of the Treaty between Australia and the Republic of Indonesia on the Zone of Cooperation in an Area

between the Indonesian Province of East Timor and Northern Australia ("Timor Gap Treaty").

43.     The Joint Authority has established a banking relationship with Chase Manhattan Bank in New York, New York.  The Joint Authority maintains and controls both depository and flow-through accounts with Chase Manhattan Bank in New York.  The Joint Authority directs those entities that owe money to the Joint Authority for activities in the Zone of Cooperation of the Timor Gap to deposit or to transfer by wire such funds to its Chase Manhattan Bank accounts.

44.     Employees of and agents of the Joint Authority spoke with representatives of the Chase Manhattan Bank in the United States by telephone and conveyed information to representatives of the Chase Manhattan Bank by facsimile or wire transmissions.  Employees and agents of the Joint Authority also had telephone and facsimile communications with employees or agents of members of the ConocoPhillips Group in the United States.

45.     Oil belonging to the Joint Authority extracted from the Elang/Kakatua oil fields in the Zone of Cooperation in the Timor Gap was, with full knowledge and approval of the Joint Authority, imported into the United States where it was sold for the commercial benefit of the Joint Authority.

### E.    The Designated Authority

46.    Defendant Timor Sea Designated Authority for the Joint Petroleum Development Area ("Designated Authority") is the unincorporated entity established by the Joint Commission pursuant to Article 6 of the Timor Sea Treaty Between the Government of East Timor and the Government of Australia ("Timor Sea Treaty").

47.    The Designated Authority is a customer of Chase Manhattan Bank in New York, New York.  The Designated Authority maintains and controls both depository and flow-through accounts with Chase Manhattan Bank in New York.  The Designated Authority directs firms that owe money to it for activities in the Joint Petroleum Development Area of the Timor Gap to deposit or transfer by wire such funds to its Chase Manhattan Bank accounts.

48.    Employees and agents of the Designated Authority spoke with representatives of the Chase Manhattan Bank in the United States by telephone and conveyed information to the Chase Manhattan Bank by facsimile or wire transmission. Employees and agents of the Joint Authority also had telephone and facsimile communications with employees or agents of members of the ConocoPhillips Group in the United States.

49.    Oil belonging to the Designated Authority extracted from the Elang/Kakatua oil fields in the Joint Petroleum Development Area in the Timor Gap was,

with full knowledge and approval of the Designated Authority, imported into the United States where it was sold for the commercial benefit of the Designated Authority.

F.   **The Pertamina Group**

50.     Defendant PT Pertamina (Persero) ("Pertamina") is a company organized under the laws of the Republic of Indonesia with a principal place of business in Jakarta, Indonesia.  At all relevant times during the complaint, Pertamina shipped petroleum resources to the United States, maintained bank accounts in the United States, owned property in the United States, and maintained offices in the United States, including, but not limited to, offices in New York, New York; Houston, Texas and Los Angeles, California.

51.     Defendant Badan Pelaksana Kegiatan Usaha Hulu Minyak Dan Gas Bumi ("BP Migas") is a company organized under the laws of the Republic of Indonesia. BP Migas is the successor in interest to many of Pertamina's rights and obligations.

52.     As used in this Complaint, defendants Pertamina and BP Migas make up the Pertamina Group.  It also includes others, some of whom knew of the illegal conduct of the Pertamina Group, including the conduct of and participation in the illegal enterprise; and some of whom carried out the Pertamina Group's illegal activities under the supervision of and direction of others in the Pertamina Group, including the conduct of and participation in the illegal enterprise.  These include, but are not limited to, General Suharto, Bambang Trihatmodjo, Hutomo "Tommy" Mandala Putra, P.T.

McDermott International, Mohammed "Bob" Hasan, Suyitno Padmosukismo and Tabrani Ismail.

**G.      Doe Defendants**

53.      Plaintiffs are unaware of the true names and capacities, whether individual, corporate, associate or otherwise, of defendant Does 1 through 50, and therefore sue these defendants by their fictitious names.  Plaintiffs will seek leave to amend this complaint when the identities of the Doe defendants are known.

54.      Plaintiffs are informed and believe, and on that basis allege, that at all relevant times mentioned in this Complaint, defendants, and each of them, were acting in concert and active participation with each other in committing the wrongful acts alleged herein, and were the agents or alter egos of each other and were acting within the scope and authority of that agency and with the knowledge, consent and approval of one another.

**IV.      FACTUAL BACKGROUND AND COMMON ALLEGATIONS**

**A.      Oceanic and Petrotimor Obtain the Timor Sea Energy Concession**

55.      The saga from which this lawsuit emanates began in 1642 when Portugal colonized East Timor.  After the battle of Pen Fui, in 1749, the Dutch and Portugese divided the island of Timor into Dutch West Timor and Portugese East Timor. The facts in this lawsuit relate to East Timor.

56.     Unknown until the mid-part of the Twentieth Century, vast oil and natural gas resources were located off the southern shore of East Timor in reservoirs below the Timor Sea.

57.     Oceanic, at the end of 1968, applied to the Portugese government for the concession in an area off the East Timor southern coast to explore for petroleum and petroleum equivalents.  Thereafter, in a period between 1969 and 1974, Oceanic undertook extensive research and study, including gathering seismic information and preparing detailed prospect maps in preparation for exploratory drilling in the Timor Sea.

58.     The Portugese Ministry of Overseas offered Oceanic the first draft terms of a potential concession for the exploitation of hydrocarbons off of East Timor in January 1970.

59.     Negotiations between Portugal and Oceanic commenced and drafts of the concession were exchanged in 1970, accompanied by numerous visits of Oceanic officials to Portugal.

60.     During this period, Australia began to adopt the position that it was entitled to the possible hydrocarbon reserves in the Timor Sea off of East Timor's coast. Australia took this position despite the fact that the Geneva Convention on the Law of the Sea codified the principle that maritime boundaries should be an equal distance between respective countries' shore lines, approximately 300 hundred miles off of each country's coast.  Australia argued instead that the division for recognition of the exercise of

dominion by Portugal and Australia should be drawn a mere 40 miles off the East Timor coast, which would leave the ultimately discovered oil and natural gas reservoirs in the possession of Australia.

61.     At the same time, Australia was conducting negotiations with Indonesia and on May 17, 1971, Australia and Indonesia signed the Australian-Indonesian Continental Shelf Agreement which delineated the maritime border between Australia and Indonesia.  Because East Timor was a Portugese province, the agreement did not address a maritime border in the Timor Sea between East Timor and Australia.  Therefore the boundary line under this agreement between Australia and Indonesia had a gap for that area between East Timor and Australia.  This gap in the boundary line came to be known as the "Timor Gap."

62.     Oceanic, during 1971, continued to negotiate with Portugal concerning the terms of the concession to be granted by Portugal in the Timor Gap.

63.     On August 2, 1972, the Portugese Ministry of Overseas granted a provisional concession to Oceanic so that work could proceed, but indicated that a final approval awaited the investigation of a special subcommittee to determine the legality of the concession.  As a formality, Oceanic was required by the Portuguese Government to create a Portuguese subsidiary to administer the concession, Petrotimor Companhia de Petroleos S.A.R.L. ("Petrotimor").  The by-laws for Petrotimor were completed on April 8, 1972 and submitted to the Portugese Ministry of Overseas for final approval.  At all

times relevant to this Action, all parties recognized that Oceanic was in fact the real party in interest with respect to the rights vested by the concession.

64.     Throughout this period, Australia continued to express disapproval to Portugal as to its assertion of sovereignty for the offshore sea area to the equidistant point between Australia and East Timor.  For example, on March 5, 1973, the Australian Department of Foreign Affairs wrote to Portugese Ambassador Wemans, proposing that negotiations between Australia and Portugal should commence early thereafter to negotiate maritime boundaries in the Timor Sea.  The Australian Minister for Minerals and Energy, Rex Connor, advised Parliament on May 2, 1973, that discussions with Portugal relating to the seabed would likely commence later that year.

65.     Portugal, on January 31, 1974, issued Decree No. 25-74, Article 1, which authorized the Portugese Ministry of Overseas to grant the concession to Oceanic. The Decree specifically was to have force outside of Portugal.  The Decree itself brought a strong diplomatic protest from Australia.  Australian Prime Minister Gough Whitlam, on March 25, 1974, stated in a television interview that the Australian government has formally protested Portugal's "encroachment" into offshore resources.

66.     On December 11, 1974, pursuant to the Decree authorization, the concession was signed.  It awarded Plaintiffs the exclusive rights to explore for and extract any oil, natural gas or other hydrocarbon products in a 14.8 million acre area of the south shore of East Timor in the Timor Gap.  The concession vested in Plaintiffs

property rights in the liquid or gas natural hydrocarbons within the 14.8 million acre concession area.

67.     Subsequently, on July 1, 1975, Petrotimor's manager in Dili, Jaime Fernandes Dos Santos, established an office in Dili, the capital of Portugese Timor.

68.     Mr. Dos Santos previously was employed in the Logistics Section of the Portugese Military based in Dili, East Timor.  On or about May 1975, Antonio Ricardo, who had been managing Plaintiffs' interests in East Timor, offered Dos Santos the job as the manager of Plaintiff's East Timor oil interests.  At the time of Dos Santos' interview, Ricardo showed him a map which was attached to Portuguese Decree No. 25/74, identifying the area in the Timor Sea granted to Plaintiffs' in the concession from Portugal, the area in which Dos Santos was to monitor exploration and seismic activity.

69.     In or about June 1975, Dos Santos accepted the offer.  As required by the Portuguese government, Dos Santos announced his new employment in the Government Gazette No. 30, dated July 1, 1975.

70.     In or about June 1975, Dos Santos negotiated the lease for a new Petrotimor office located at 10 Mousinho de Albuquerque Street, Dili, East Timor.  Dos Santos began planning to refurbish the office space and interviewing potential employees for the new Dili office.  Dos Santos opened a bank account for Petrotimor with Banco Nationale Ultramarino in or about August 1975.

71.     In early to mid-July 1975, Dos Santos met with Avelar Barbosa, a Portuguese government geophysicist and engineer.  Barbosa acted as a liaison to the Portugese Government in Lisbon and was to report to Portugal regarding the exploration activities in the Timor Sea.

72.     Timor Oil, which was managed by Mr. Ricardo, maintained an office in Dili approximately 500 yards from the new Petrotimor office.  Until the Petrotimor office was finished and could be made secure, Plaintiffs' stored in the office of Timor Oil their geographical and seismic data of the Timor Sea and other confidential and proprietary information gained from its exploration activities.  Given the confidential and proprietary nature of this exploration data, access to that data was restricted.  Dos Santos anticipated transferring Plaintiffs' confidential and proprietary information to the new office once it could be made secure.

73.     Australia was realizing at that same time that it might have difficulties negotiating with the Portugese to secure a favorable stake in the Timor Sea.  A confidential policy planning paper issued by the Australian Department of Foreign Affairs, written on May 3, 1974, stated:

> The attitude of the Portugese government will also be affected by its assessment of the future commercial prospects for Portugese Timor, and in particular for tourism and oil and natural gas.  There are good possibilities both for an increase in tourism and the

discovery of oil or natural gas deposits (either by an Australian or United States company), and the likelihood of increased revenues would increase the reluctance of Portugal to relinquish control over the territory.

74.     This confidential policy planning paper further stated, as a recommendation:

> We should press ahead with negotiations with Portugal on the Portugese Timor Seabed boundary, but bear in mind that the Indonesians would probably be prepared to accept the same compromise as they did in the negotiations already completed on the seabed boundary between our two countries.  Such a compromise would be more acceptable to us than the present Portugese position. For precisely this reason, however, we should be careful not to be seen as pushing for self-government or independence for Portugese Timor or for it to become part of Indonesia, as this would probably be interpreted as evidence of our self-interest in the seabed boundary dispute rather than a genuine concern for the future of Portugese Timor.  We should continue to keep a careful check on the activities of Australian commercial firms in Portugese Timor.

75.     The speculation as to magnitude of the oil and natural gas reservoirs lying offshore to East Timor has been confirmed.  A number of successful wells have been drilled and have verified the existence of major, world-class natural gas and oil reserves valued at over US$50 billion.

76.     After Indonesia invaded East Timor, Plaintiffs sought and obtained from Portugal an acknowledgment that the invasion of East Timor and the forced displacement of the Portuguese administration triggered the force majeure clause in the concession, which suspended any obligation of plaintiffs to continue performance in the face of these hostilities.

77.     Notwithstanding the state of force majeure, Oceanic and Petrotimor continued to pursue recognition of and enforcement of their rights to the oil and gas underneath the Timor Sea.

78.     Beginning in 1976 and until the creation of the Joint Authority, representatives of Oceanic sent letters to and attempted to meet with representatives of Indonesia, including but not limited to General Suharto, in an effort to get the appropriate Indonesian authorities to acknowledge Oceanic's interest in and rights to the oil and gas resources under the Timor Sea.  Oceanic's efforts to arrange a meeting with any authorized representative of Indonesia were unsuccessful.

79.     With the formation of the Joint Authority, Oceanic continued to press for the recognition of its rights to and interest in the oil and gas under the Timor

Sea.  Oceanic inquired of and attempted to meet with not only representatives of the Joint Authority, but with representatives of Pertamina and Australia.  Again, Oceanic's efforts were unsuccessful.

80.     Shortly after the United Nations Transitional Authority for East Timor became the transitional governing authority in newly independent East Timor, Oceanic again attempted to meet with the responsible parties, including the members of the governing authority and individuals in East Timor's provisional parliment.  In addition to seeking recognition of its current rights to and interest in oil and gas under the Timor Sea, this time Oceanic attempted to seek from UNTAET, as the provisional governing authority, a geographical expansion of its current rights to or interest in the oil and gas in the Timor Sea.  Oceanic's efforts, as later outlined, might have strengthened East Timor's claim to expanded seabed boundaries under international law, but were ultimately unsuccessful.

81.     Mari Alkitiri refused to meet with Oceanic's representatives.  As a direct result of Oceanic's efforts to meet with Mr. Alkitiri, he asked Sergio Vieira de Mello, Chief of UNTAET, to issue an edict prohibiting any UNTAET employee from speaking with Plaintiff's representatives.  de Mello acceded to Alkitiri's request.  On October 10, 2001, de Mello issued a memorandum acknowledging Alkitiri's request and stating that "[b]y this memorandum, I wish to instruct all UNTAET personnel to have no contacts with these representatives or their associates."

82.     Most recently, Oceanic representatives made a short presentation to Mari Alkitiri and Niny Borges at the United Nations Building in New York, New York on September 27, 2002.  Alkitiri appeared to listen, but never acknowledged Oceanic's request for a broadening of its concession or Plaintiffs' rights to the oil and gas in the Timor Sea.  The meeting produced no results.  Oceanic's subsequent efforts were ultimately met with silence.

### B.     Australia's Desire for the Oil in the Timor Sea Resulted in its Blessing of Indonesia's Invasion and Forcible Annexation of East Timor

83.     Australia has had a long history with the people of East Timor.  In December 1941, Australian commandos landed there in an attempt to prevent the Japanese from building air fields from which a potential invasion of North Australia could be launched.  The Australian presence drew the immediate attention of the Japanese military.  The ensuing Japanese invasion resulted in the killing of more than 40,000 Timorese, many of them as a result of torture.  The Australian commandos hurriedly withdrew from Timor.  In 1943, the Royal Australian Air Force dropped leaflets over Timor which stated that "Your friends will never forget you."  As history ultimately unfolds, the fact never forgotten by Australia's politicians was the oil, not the people.

84.     The Australian government, in 1974, became aware that Indonesia was planning a secret invasion of East Timor.  On July 3, 1974, in a top secret letter from Robert Furlonger, then Australia's Ambassador to Indonesia, to Graham Feakes, the First

Assistant Secretary of Australia's Department of Foreign Affairs, Furlonger wrote specifically about Indonesia's clandestine operation in Portugese Timor.  That paper stated that Indonesia was considering incorporating Portugese Timor into Indonesia.

85.     Indonesia informally requested that Australia participate in neutralizing adverse reaction to the invasion that might arise in other countries. Australian officials noted at that time that Australia would not wish officially to hear about the running of a covert operation in East Timor.  On July 26, 1974, Assistant Secretary Feakes' wrote Ambassador Furlonger that "the Indonesians [should] not be under any possible illusion that we might take a diplomatic initiative as our part of a deal in which they did the dirty work in Portugese Timor."

86.     A secret meeting was held on August 21, 1974 between officials of both Indonesia and Australia.  Indonesia advised Australia that Australia's participation would be crucial in helping Indonesia meet the "problems of public presentation."

87.     Australia's highest government officials knew that Indonesia was going to mount a covert operation in East Timor.  A secret brief prepared for the then Prime Minister of Australia, Gough Whitlam, stated:

> During your forthcoming visit to Indonesia, President Suharto
>
> will expect to receive an authorative statement from you of
>
> Australia's attitude toward Portugese Timor.  A visit to Canberra
>
> between 20 and 22 August by Mr. Harry Tjan of the Center for

Strategic and International Studies in Jakarta to sound out our

thinking at an official level confirmed earlier indications of the

importance that President Suharto attaches to this aspect of your

visit.  Mr. Tjan is President Suharto's principal policy advisor on

Portugese Timor....  It is our impression that President Suharto finds

the view that Indonesia should absorb Portugese Timor persuasive....

The presidential agency OPSUS ("Special Operations") has planned

a covert political operation to persuade the people of Portugese

Timor to accept absorption into Indonesia.  Agents to carry out the

operation are already in place in Indonesian Timor.  We believe that,

during his visit to Canberra, we persuaded Harry Tjan to advise

President Suharto against proceeding with this operation before you

visit Indonesia.

88.    Later in September 1974, Prime Minister Whitlam, accompanied by

the then Australian Ambassador to Indonesia Furlonger and his successor, Richard

Woolcott, met with Indonesian's President Suharto to discuss the future of Portugese

Timor.  The Australian officials left the "impression" that the Australian government

understood Indonesia's position and would not oppose East Timor's integration into

Indonesia.

89.     A confidential record authored by Assistant Secretary Feakes to John Lavett, Assistant Secretary for the South-East Asia branch of the Department of Foreign Affairs and Allister McLennan, head of the Department of Foreign Affairs for the Indonesian Section, stated that "Australia naturally has important particular interests in Portugese Timor (for example, in oil exploration) but we have no ambition to achieve a special position there."  Feakes went on to express his concern about specifically identifying oil exploration as a particular Australian ambition and instead suggested that the wording and any expression of interest for oil exploration be changed to refer to "delineation of the continental shelf."

90.     A confidential priority cablegram to Australia's Minister at the United Nations at the same time stated:  "An inter departmental meeting was convened by Foreign Affairs on 25 September to consider whether the Australian government should reply to the Portugese note of 18 April which conveyed views of the Portugese government in reply to our oral protest of 25 March 1974 at Portugal's decision to grant an oil exploration concession [to Oceanic] in an area claimed by Australia to be within Australian jurisdiction."  The cable went on to discuss the advantages and disadvantages of negotiating a seabed boundary with Portugal, Portugese Timor or Indonesia. Ultimately the cablegram advised the Australian Minister to refrain from discussing the seabed boundary with the Portugese Minister and instead to wait for events in Portugese Timor to develop further.

91.     Prime Minister Whitlam met with President Suharto in Townsville, Australia, in April 1975 to discuss the East Timor issue.  Attending the meeting on behalf of Australia was Ambassador Woolcott.

92.     In preparation for that meeting, Woolcott wrote to Whitlam, stating:

While we are committed to such principles as human rights and self determination, I do not think we should, from the relative comfort of our continental Pulpit, lecture the Indonesian's on how to conduct their domestic affairs....  We could be working ourselves into a position where we are impaling ourselves on the hook of self determination....  My own belief is that we should seek to disengage ourselves as much as possible from the Timor situation which could well become pretty messy.  Indonesia is very unlikely to mount a military invasion of Timor unless it regards the situation there as hopeless and as a real threat to its security.  But the Indonesian government has not abandoned its ultimate objective of integrating Timor and it will pursue both covert and overt activity to influence Portugese Timor to decide in favor of integration at the eventual act of self determination.

93.    However, only two months later, on June 2, 1975, Woolcott then wrote to the Australian Foreign Affairs Minister Willesee, stating:

> Integration by force - - the second option mentioned above - - cannot be ruled out.  As you know the President and other leading Indonesians have given categorical public and private assurances that Indonesia would not invade Portugese Timor.  Nevertheless, in certain circumstances, I believe that President Suharto would authorize that course....  Indonesia's reaction would probably be sudden and swift....  Indonesia does not have control of Portugese Timor....  There is a distinct possibility that Indonesia will adopt the course of inspiring an insurrection.

94.    Australian officials, at roughly the same time, had informed Jose Ramos Horta, then Head of East Timor's Fretlin party and later Deputy Prime Minister of East Timor, that his fears about an Indonesian invasion were exaggerated.  Indeed, Australian officials, specifically Lance Joseph, an official in the Southeast Asia branch of the Department of Foreign Affairs and Trade, informed Horta that Australia "had no reason to believe that Indonesia was thinking of any precipitate military move in relation to Portugese Timor."

95.    Australia's real interest in condoning, and even encouraging the Indonesian invasion, was described by its Ambassador to Indonesian Woolcott in a secret

cable to the Principal Secretary to the Prime Minister of Australia in August 17, 1975, in which he stated:

> We are all aware of the Australian defense interest in the Portugese Timor situation but I wonder whether the department has ascertained the interest of the Minister or the Department of Minerals and Energy in the Timor situation.  It would seem to me that this department might well have an interest in closing the present gap in the agreed sea border and that this could be much more readily negotiated with Indonesia by closing the present gap than with Portugal or independent Portugese Timor.  I know I am recommending a pragmatic rather than a principled stand but that is what national interest and foreign policy is all about.

96.     In September 1975, Indonesian military forces began secretly moving into East Timor and on October 6, 1975, Indonesian troops attacked Batugade, a border town in East Timor.

97.     On December 7, 1975, the Indonesian military forces launched a full scale invasion of East Timor and moved into Dili, the capital.  During the ensuing Indonesian occupation of East Timor, more than 200,000 East Timorese were killed. That number represented over one third of the population of East Timor.  The United

Nations called the occupation an act of genocide.  Xanana Gusmao, the future President
of East Timor, would later describe the invasion:

> The killing was indiscriminate.  They murdered hundreds of
> people on the first day, including the Australian journalist Roger
> East.  Like him, many people were brought to the harbor, where they
> were shot one by one, as the Nazi's did.  Anyone, women, children,
> the elderly, anyone who dare venture outside their homes was shot
> down.  They smashed down doors, firing their weapons inside at
> anyone and anything.  They smashed up churches, leaving them full
> of urine and feces.

98.     Before the new Petrotimor office could be made secure and the
confidential exploration data transferred to that office, Dili was overrun by the Indonesian
military.  During the first week of the invasion, the offices of Timor Oil were targeted and
ransacked by the Indonesian Army.  Members of the Indonesian military removed, under
threat of violence and death, Plaintiffs' highly proprietary and confidential data collected
during its exploration in the Timor Sea, including maps that identified the location of the
later discovered Bayu-Undan hydrocarbon fields.  None of Plaintiffs confidential and
proprietary information was ever accounted for or recovered.

99.   Petrotimor's manager in Dili, Dos Santos, remained in Dili until the civil unrest escalated to a point where civilian lives were at jeopardy.  He fled for his own safety and did not return to Dili until 2000.

100.   Although the United Nations passed a resolution condemning the invasion and calling on Indonesia to immediately withdraw, Australia undertook a campaign to condone the actions of the Indonesians.  Ambassador Woolcott, in a cable directed to then Australian Prime Minister John Fraser, stated:  "The emphasis should be on accepting the inevitability of Timor's incorporation into Indonesia, letting the dust settle and looking ahead, while taking what steps we can in Australia to limit the further growth of hostility toward Indonesia within the Australian community."

101.   Suharto, President of Indonesia, on July 17, 1976, signed a bill declaring East Timor to be the 27th Province of Indonesia.  The United Nations refused to recognize this incorporation and took the position consistently for twenty-five years that Portugal remained the administrating power.

102.   In October 1976, Australian Prime Minister Fraser undertook an official state visit to Jakarta and acknowledged the merger of Indonesia and East Timor in a speech before the Indonesian Parliament.  Traveling with Fraser on that trip was a J. B. Reid, Director of Broken Hill Proprietary Company ("BHP"), the largest Australian energy company.  The Indonesian Justice Minister confirmed to Fraser that Indonesia was prepared to negotiate a settlement of the seabed boundary to close the Timor Gap on the

same favorable terms as the 1972 Indonesian-Australian Seabed Treaty, in return for recognition of Indonesian sovereignty over East Timor.  The Australian Foreign Minister Andrew Peacock then, on October 20, 1976, announced that the Australian government had decided to recognize de facto that East Timor was part of Indonesia.  One of the Australian Senators, Cyril Primmer, commented at the time that the decision to recognize "integration" was made in order to settle the seabed border between Australia and East Timor.  Then, on February 1979, the Australian government extended de jure recognition to Indonesian's incorporation of East Timor, noting that discussions of the maritime boundary across Timor Gap were immediately to follow.

103.    Australia was the only country to give both de facto and de jure recognition to the legitimacy of Indonesia's invasion of East Timor.  The United Nations never did.

104.    On March 17, 1995, Major General Sintog Panjaitan, the senior Indonesian officer responsible for the Santa Cruz massacre of over 200 Timorese in 1991, was invited to Canberra as the guest of honor of the Australian Defense Department. (Just five months earlier, the U.S. District Court in Boston had awarded US$14 million in damages against General Panjaitan for the murder of one of the victims of the Santa Cruz massacre.  During the trial, Panjaitan fled Boston, where he was studying at the Harvard Business School, to return to Jakarta.)  While being entertained in Canberra, Australian Foreign Minister Gareth Evans publicly defended Panjaitan by stating "Panjaitan received

his punishment by having to leave the military and I don't think that should be permanently held against him."

105.    It was not until January 12, 1999, that Australia reversed its position on East Timor and announced that East Timor had the right to self determination.  The East Timorese people, on August 30, 1999, overwhelmingly voted in favor of independence in an election sponsored by the United Nations.  Immediately thereafter, the Indonesia military and para-military forces massacred at least 2,500 East Timorese.  In September 1999, a United Nations peacekeeping force was sent to Dili, the capital of East Timor.

**C.**    **ConocoPhillips' 40-Year Involvement in Suharto's Indonesia, One of the Most Corrupt Regimes in the World**

106.    ConocoPhillips, a United States-based oil company, stated in its 2002 World Fact Book that it is the largest foreign leaseholder in Indonesia, possessing 19 exploration and production licenses that comprise roughly 20 million acres.  The company further stated that it has had a history of over 40 years in Indonesia with its core areas in Natuna, East Java and South Sumatra.  ConocoPhillips represented in an advertising brochure produced for the Indonesian market that:

> We have a long history of working with state-owned oil and gas company Pertamina and its successor BP MIGAS....  We produce 4% of Indonesia's oil and 8% of Indonesia's natural gas resources....

[ConocoPhillips] is the third largest energy company in the United

States, based on market capitalization, and globally the fifth largest

refiner and eighth largest publicly owned oil and gas company.

ConocoPhillips has been involved in the Indonesian oil and natural

gas industry for more than four decades.

107.   During most of this period, Indonesia was run by President Suharto,

a former Army Colonel who came to power in Indonesia in the mid-1960's, and was

elected President in 1968.  During the course of his 30+ year reign as President, Suharto

amassed wealth stated by Time Magazine in 1988 to be US$16 billion.  Other reports put

the personal worth of Suharto and his family acquired during his tenure as President as

high as US$30 billion.

108.   In 2001, the World Bank reported that Indonesia was one of the

world's most corrupt economies.  As a result, the World Bank sought to require that

Indonesia implement corrective measures to counter the corruption before further

financial relief packages could be extended.

109.   The corruption in Indonesia on behalf of Suharto, his cronies and his

family was effectuated in a variety of different ways as it pertained to foreign oil interests

operating in Indonesia.

1.     **ConocoPhillips Effectively Help Fund The Invasion of East Timor Through its Illegal Payments to Pertamina Officials**.

110.    Pertamina, the Indonesian state oil company, was formed in 1968 in a merger between Permina and Pertamin.  The new company, Pertamina, was a required participant in all ventures involving the extraction of natural gas and oil in Indonesia.

111.    All foreign oil companies actually had to contract with Pertamina. This joint participation was formalized in production sharing contracts.  ConocoPhillips always entered into such contracts in Indonesia.  ConocoPhillips also signed production sharing contracts regarding reserves in the Timor Sea during the period of Indonesia's joint participation in the theft of Plaintiffs' property in that area.

112.    Pertamina, through use of the production sharing contracts, siphoned off for the direct benefit of Suharto and his cronies a significant amount of the oil revenues.  This corruption was with the knowledge and participation of the foreign oil companies working in Indonesia, including ConocoPhillips.

113.    ConocoPhillips, even before the onset of the use of production sharing contracts, had regularly and systematically been making bribes in Indonesia in order to compete for concessions.  ConocoPhillips' Director of Contracts and Acquisitions for Indonesia, Arthur Bennett, from the mid-1960's to mid-1970's actively engaged in paying bribes to Indonesian officials, particularly Pertamina officials, to secure ConocoPhillips' foothold in Indonesia.

114.    The establishment of Pertamina, however, regularized the corruption payments made by ConocoPhillips.

115.    First, Pertamina required that ConocoPhillips utilize certain specified Indonesian contractors.  Those contractors were owned by Suharto, his family members and other Suharto cronies.

116.    One of the required subcontractors was P.T. McDermott Indonesia, which was a joint venture between McDermott International and Mohammed "Bob" Hasan.  McDermott provided the resources and expertise, while Hasan handled interface with the Indonesian government and Pertamina.  If oil companies were to receive approval for projects, they needed to use P.T. McDermott in those projects.  Hasan typically would receive a 20% agent fee for his efforts.  That fee was then paid to the Suharto family.  ConocoPhillips regularly used P.T. McDermott in Indonesia.  The company knew that the "agent fee" was a bribe for Suharto.

117.    Second, Pertamina exported the oil resulting from the joint venture participation of foreign oil companies through two marketing companies, Perta Oil Marketing and Permindo Oil Trading.  Both companies were substantially owned by Suharto's sons.  Each barrel of oil sold required commissions of 30¢-35¢, paid to Suharto or his agents.  Other mark-ups in the sale of oil exports garnered to the Suharto family as much as US$200 million a year in the 1980's and approximately half that amount during the 1990's.

118.    Third, Pertamina, through mandates imposed by Presidential Decree issued by Suharto, was required to donate varying percentages of its revenues to private foundations that were controlled by Suharto, his family and his cronies, most particularly various military leaders in Indonesia.  These private foundations have been described as "key vehicles for institutionalized corruption" in Indonesia.  Although having an ostensible charitable purpose, no legal requirement compelled the foundation to disburse any revenues for the stated public purpose.  Rather, the foundations then controlled business conglomerates - - a matrix of for-profit businesses - - that were in turn the vehicle for ownership of much of the natural resources and manufacturing activities in Indonesia.  The Suharto foundations invested massively in the private companies contained within the business conglomerates.  Often the remaining ownership for the business conglomerates were directly in the name of Suharto, his family and his cronies.  An example is the Nusamba conglomerate which was principally owned by three Suharto foundations:  30% from the Dakab Foundation; 25% from the Dhamais Foundation and 25% from the Supersemar Foundation.  The remaining 20% was owned by Suharto's eldest son and by Bob Hasan.  The Dhamais Foundation was ostensibly established to provide health care; the Dakab Foundation was ostensibly established to promote religious activities and the Supersemar Foundation was ostensibly created to promote education.  The foundations also regularly provided funds to the business conglomerates.  In an investigation conducted after Suharto's resignation, the Attorney General for

Indonesia discovered that Supersemar had disbursed 84% of its funds on unauthorized pursuits, including loans to companies owned by Suharto's children and friends.  The initial operating capital for the Nusamba business conglomerate was US$1.5 billion.

119.    The foundations also significantly supplemented the incomes of the military leadership in Indonesia and financed "unofficial" paramilitary activities.   The military invasion and control of East Timor was significantly funded through Suharto-sponsored foundations.

120.    ConocoPhillips, in effect, helped fund Indonesia's invasion and annexation of East Timor through its improper and illegal payments to Pertamina and the flow through to the Suharto foundations.

2.    **ConocoPhillips Paid a Bribe or Kickback to Pertamina Through the Purchase of a Purported Joint Venture Interest with a Shell Corporation**.

121.    ConocoPhillips participated in more direct corrupt practices in order to secure and maintain its oil and natural gas interests in Indonesia.  In the mid-1980's, officials of Pertamina established a shell corporation known as Rainbow, operating out of Los Angeles, California.  ConocoPhillips, seeking to secure production sharing contracts, entered into "joint ventures" with Rainbow during every tender process for energy rights.  Upon a successful award, ConocoPhillips then "bought out" Rainbow's interest in the "joint venture."  ConocoPhillips payment to Rainbow for its interest in the "joint venture"

was nothing more than a bribe paid to Pertamina officials for the award of new production sharing contracts.

122.    Rainbow registered with the California Secretary of State, but it never established a physical office.  It represented to the California Secretary of State that its business address was on Sunset Boulevard in Los Angeles, California.  In truth, that business address was nothing more than a post office box in a commercial mail box store.  Rainbow existed solely as a device to channel bribes or kickbacks to Pertamina officials.  This scheme operated throughout the period of 1985 through 1995.

### 3.    ConocoPhillips' Deals With Pertamina Allowed it to Commit Tax Fraud.

123.    ConocoPhillips also participated in Indonesian corruption through the use of a complex tax scheme.  This scheme also allowed ConocoPhillips fraudulently to understate its U.S. taxes.

124.    The device to perpetrate this scheme was the production sharing contracts between Indonesia and ConocoPhillips.  Under these agreements, ConocoPhillips received a portion of the oil actually extracted.  Pertamina received another portion, with a further portion then going to Pertamina for sale for the benefit of Indonesia.  By agreement, each party treated the barrels of oil as being sold at a pre-established price well above actual market price.

125.    By treating its portion of the oil as being sold for an above market price, ConocoPhillips overstated its revenues.  Indonesia imposed and ConocoPhillips paid taxes on those overstated revenues.  Indonesia recognized that ConocoPhillips was overpaying taxes.  To bring that overpayment into balance, Pertamina granted ConocoPhillips a right to extract and sell additional oil in an amount equivalent to the amount to the taxes that ConocoPhillips overpaid to Indonesia—a refund in kind.

126.    ConocoPhillips reported on its consolidated United States corporate income tax returns the initial foreign tax amount assessed by Indonesia.  ConocoPhillips did not reflect the refund oil on its tax returns, even though that refund was recognized by all parties to be a refund of taxes paid to adjust for the ghost "sale" of oil at the pre-set, artificial, and above market price.

127.    The Internal Revenue Code allows corporations to credit against United States taxes certain taxes paid abroad—the foreign tax credit.  Because foreign taxes operate as a credit against payment of U.S. federal taxes,  ConocoPhillips' failure to account for the refund of oil meant that each year it overstated the amount of its foreign tax credit.  By overstating its foreign tax credit for each year, ConocoPhillips' grossly understated its federal tax obligation to the United States.

128.    ConocoPhillips knew that it was receiving oil that was not subject to Indonesian taxes for each tax year.  ConocoPhillips knew that it was receiving this oil for the sole purpose of offsetting the taxes overpaid to Indonesia due to the sale of oil at

artificial, pre-set, above-market prices.  ConocoPhillips knowingly did not reduce the amount that it claimed to have paid in Indonesia taxes.

129.    Through this scheme and artifice to defraud, ConocoPhillips defrauded the United States of taxes properly due and owing for all tax years since at least 1975, perhaps earlier, through tax year 1993.  Through this scheme and artifice to defraud, ConocoPhillips avoided and evaded United States taxes that would have been properly due and owing for all these tax years.

130.    ConocoPhillips uses a calendar year as its tax year.  On or about the September 15th following the close of each tax year, ConocoPhillips mailed or caused to be mailed to the Internal Revenue Service Center in Austin, Texas, a United States corporate income tax return (Form 1120).  Both Schedule J of Form 1120 and the associated Form 1118 contained false and fraudulent overstatements of ConocoPhillips' claimed foreign tax credit.  Each Form 1120 and associated schedules that ConocoPhillips mailed to the Internal Revenue Service Center materially and falsely overstated the amount of foreign tax credit that ConocoPhillips claimed in a cumulative amount of millions of dollars.

131.    ConocoPhillips' failure to accurately report the foreign tax credit and the resulting overstatement of that credit on its United States corporate income tax returns and associated schedules with the concomitant underpayment of taxes further enriched both Indonesia and ConocoPhillips for the benefit of sustaining its operations in

Indonesia.  This underpayment of U.S. taxes, fraudulently secreted from the U.S.

government in the reporting of Indonesia-related operations by ConocoPhillips, defrauded

the United States of millions of dollars in taxes that otherwise would be have been

payable and provided financial resources for ConocoPhillips to continue to pay off

corrupt Indonesian officials.  This corruption allowed ConocoPhillips to secure a favored

position when Pertamina officials began to award exploitation rights in the Timor Sea.

**D.** **The Joint Authority Gains Control Over Oil and Natural Gas Reserves in the Timor Sea and Makes ConocoPhillips the Largest Contractor**

132.    As a direct result of the forbearance of Australia in interceding in

Indonesia's invasion of East Timor, Australia and Indonesia agreed in 1981 to a dividing

line across the Timor Gap pertaining solely to fishing rights.  This boundary was the

median line between Timor and Australia and coincided with the southern boundary of

Zone A which was later established by the Timor Gap Treaty for the division of oil rights.

133.    Thereafter, on December 11, 1989, Indonesia and Australia signed

the Treaty between Australia and the Republic of Indonesia on the Zone of Cooperation

in the area between the Indonesian province of East Timor and Northern Australia

("Timor Gap Treaty"), effective February 9, 1991.  That treaty created a Zone of

Cooperation in the Timor Gap, substantially corresponding to the Plaintiffs' Timor Sea

concession, in which Indonesia and Australia could both profit from the commercial

exploitation of any oil or natural gas found.  The Timor Gap Treaty created the Timor

Gap Joint Authority for the Zone of Cooperation ("Joint Authority") with the purported

legal capacity to enter into production sharing contracts with private corporations.

(Ultimately, through the selection process undertaken by the Joint Authority,

ConocoPhillips became the largest participant in the exploitation for this area, despite the

fact that ConocoPhillips had never undertaken any seismic or geological surveys in the

area.)

134.    The then Australian Foreign Minister Gareth Evans and Indonesian

Foreign Minister Ali Atlas signed the treaty while flying over the Timor Sea in an

Australian Air Force plane.  During the ceremony, while toasting each other with

champagne, Evans declared that the oil revenues would be in the "zillions of dollars."

135.    Australia and Indonesia in late December 1989 created the Joint

Authority with representatives from both countries to be responsible for the awarding of

and contracting with oil interests for exploitation of the Timor Gap.  The Joint Authority

established its head office in Jakarta, with an operating office in Darwin, Australia.  The

Indonesian representatives to the Joint Authority were Pertamina officials.

136.    Upon an exchange of notes between the two countries, the Timor

Gap Treaty entered into force on February 9, 1991.  The Timor Gap Treaty created a

"Ministerial Council," which had executive "responsibility for all matters relating to the

exploration for and the exploitation of the petroleum resources in Area A of the Zone of

Cooperation and such other functions relating to the exploration for and exploitation of

petroleum resources . . . ."   The goal was to "achieve of the optimum commercial

utilization of the petroleum resources of Area A . . . ."

137.   The Ministerial Council had numerous responsibilities, including,

among others, oversight of the Joint Authority, including appointment of the Joint

Authority's Executive Directors.  The Ministerial Council granted the Joint Authority the

right to "market any or all petroleum production" and gave final approval to the Joint

Authority prior to "distribution to Australian and the Republic of Indonesia of revenues

derived from production sharing contracts."

138.   The Joint Authority was created as a separate and distinct business

entity formed to manage the "activities relating to exploration for and exploitation of the

petroleum resources in Area A."  The Joint Authority was actively involved with third-

party petroleum companies in the extraction and exploitation of oil.

139.   Because the Joint Authority was to function as a free-standing entity,

it had independent legal status, with the ability "to contract, to acquire and [sic] dispose of

moveable and immovable property and to institute and be party to legal proceedings."

The Joint Authority was granted enumerated powers and responsibilities, such as the

division of Area A into zones of oil exploration and production, negotiation of Production

Sharing Contracts with private corporations and supervision of the oil exploration

activities, termination of the production sharing contracts, collection and distribution of

any proceeds from petroleum production, and preparation of annual income and

expenditure financial estimates.  The Joint Authority maintained bank accounts with the Chase Manhattan Bank in New York City, New York.  It is through these accounts that the Joint Authority conducted its financial transactions, namely the regular and continuous receipt of revenues for the commercial exploitation of oil, including revenues from the sale of its own portion of oil and natural gas and the collection of royalties.

140.    The Timor Gap Treaty stated that the contemplated Production Sharing Contract was an agreement between the Joint Authority and a third-party petroleum company which "provide[s] for the contractor to take a share of petroleum production as payment from the Joint Authority for the petroleum operations."  Thereafter, the Production Sharing Contract requires the contractor to "pay to the Joint Authority, at regular periods . . . an amount of money estimated to be equal to the value of the Joint Authority's share of petroleum production lifted for those periods."  These details, such as the length of each period, and the estimated value of the Joint Authority's share of petroleum production, were all listed in the Production Sharing Contract.

141.    The Joint Authority could and did directly act as a commercial entity by participating in the exploitation of oil, pursuant to Article 4 of the Timor Gap Treaty.  "The Joint Authority, with the approval of the Ministerial Council, may market any or all petroleum production."  The value of the "Joint Authority's share of petroleum production . . . shall be based on the work program and budget of operating costs and revisions to it, and the expected value of quantities to be produced."

142.    Pursuant to Article 9 of the Timor Gap Treaty, the Joint Authority Executive Directors were appointed by the Ministerial Counsel.  Under the supervision of the Executive Directors was the Technical Directorate, which was responsible for "operations involving exploration for and exploitation of petroleum resources," the Financial Directorate, which was responsible for "collecti[ng] fees and proceeds from the sale of the Joint Authority's share of production," the Legal Directorate, which was responsible for "providing advice on any legal issues relating to production sharing contracts and on the operation of law applying in Area A," and the Corporate Services Directorate, which was responsible for "administrative support to the Executive Directors and the three other Directorates and to service the meetings of the Ministerial Council." The Executive Directors and the four Directorates comprise the Joint Authority's "Executive Board."

143.    The first ministerial counsel meeting took place on February 9, 1991 in Denpasar, Indonesia.  The Joint Authority then released for tender 14 contract areas in Zone A of the Zone of Cooperation created by the Timor Gap Treaty.  The announcement of the tendering process stated that Australian companies previously holding exploration permits granted by Australia in the area would be offered generous preferential consideration of blocks of their choice within the Area A.  Previously, Woodside Petroleum, Petroz and Elf Aquitaine had held rights to four exploration permit areas located within Zone A.

144.     Bidding actually was opened June 24, 1991 with the close of applications for permits on October 7, 1991.  A month later the Ministerial Counsel for the Joint Authority - - specifically the Minister for Mines and Energy on behalf of the Government of the Republic of Indonesia and the Minister for Resources on behalf of the Government of Australia - - approved production sharing contracts in Blocks 91-13 and 91-12.  The most significant participant in Block 91-13 was ConocoPhillips.  Tenders were evaluated by the financial commitment to be undertaken by the bidding company in exploring for potential hydrocarbon resources in the geographical block subject to the bid.  ConocoPhillips bid an extraordinarily high amount in comparison with other offerors to secure Block 91-13.

145.     ConocoPhillips' success in identifying what ultimately proved to be a very large reserve of hydrocarbons in the Timor Gap--a confidence reflected in its high tender price to secure those rights--resulted from Pertamina having provided to ConocoPhillips the survey and geological data previously prepared by Plaintiffs and stolen by the Indonesian military from Timor Oil's office in Dili in 1975.  This data identified accurately the locations ultimately utilized as the well sites for the largest gas fields in the Zone of Cooperation.  ConocoPhillips, as a result of having this stolen data, was able to successfully identify the well locations in the Block for which it had been awarded concessions.

146.    The production sharing contracts entered into between ConocoPhillips and the Joint Authority were identical in form to those that ConocoPhillips had previously entered into with Pertamina and the government of Indonesia for exploration in Indonesia.  Thereafter, ConocoPhillips entered into subcontracts with P.T. McDermott to provide goods and services used in drilling wells and fabricating extraction structures in the Timor Sea.  A portion of the proceeds paid to P.T. McDermott were paid to Bob Hasan as a "commission."  Bob Hasan, in turn, paid Suharto and his cronies in Indonesia.  The corruption by ConocoPhillips thus continued in the Timor Sea.

147.    ConocoPhillips, in 1994, drilled the Bayu-1 well in Block 91-13. That well discovered a significant gas field in the Zone of Cooperation.

148.    The Elang-1 well first discovered oil in the Timor Gap in January 1994.  Although the well was originally undertaken by a BHP-led joint venture, ConocoPhillips, in April 1999, bought out all of BHP's interests in the Timor Sea for a reported A$300 million.

149.    The Kakatua-1 well discovered oil in December 1994 in Block 91-12.  This block was ultimately purchased by ConocoPhillips in its acquisition of BHP's interests in the Timor Sea.

150.    Thereafter, in July 1995, the Undan-1 well was drilled resulting in the discovery of a large gas condensate accumulation within Block 91-12. ConocoPhillips also acquired BHP's interest in this Block.

151.    Oil was discovered in what was later identified as the Kakatua North-1 well in an oil field immediately north of the previously drilled Kakatua well. This property, also located in Block 91-12, was ultimately acquired by ConocoPhillips.

152.    BHP estimated in May 31, 1998 that the oil reserves in Block 91-12 were over 13.5 million barrels of crude oil.  Oil was first produced from the combined Elang, Kakatua and Kakatua North fields in July 1998.  After only four months of operation, the commercial value of the oil extracted from Elang-Kakatua was estimated to be A$250 million.

153.    In the period between 1992 and 1998, ConocoPhillips acquired an overall 60% interest in the Block 91-13, including the purchase of Bridge Oil Company's 22.5% interest for approximately US$78 million.  ConocoPhillips estimated at the time that the gross hydrocarbon recovery potential from the Bayu-Undan gas field in Blocks 91-12 and 91-13 to be 400 million barrels of petroleum liquids and 3.4 trillion cubic feet of natural gas.

154.    The executive board of the Joint Authority in February 1999 described the sharing mechanism between the operators and the countries for revenues received from extracted oil in the Elang-Kakatua field:

Consistent with the production sharing provisions of the PSC's, the Joint Authority receives its share of "First Tranche Petroleum" on behalf of the Contracting States.  This share amounts to 5% of petroleum production at current levels of production from the Elang-Kakatua-Kakatua North field.  The first receipt of revenue from the sale of petroleum from the Elang-Kakatua-Kakatua North field was received on 5 October 1998.  These revenues are received into a special fund bank account held with the Chase Manhattan Bank in New York, where interest is earned under an enhanced automatic investment program. The petroleum revenues and interest are shared equally between the Contracting States and transferred to the accounts nominated by the Contracting States on the 15th of each month.

**E.**   **The Expulsion of Indonesia from East Timor and Australia's and ConocoPhillip's Successful Efforts to Switch Sides**

155.   In the period between January and March 1998, the International Monetary Fund threatened to cancel Indonesia's rescue package which previously had been structured because of the 1997 East Asia currency crisis.  The stated reason for the cancellation was Suharto's refusal to break up his family monopolies.  As a result of this action, the currency in Indonesia went into a free fall resulting in food shortages and

immediate social unrest.  Rioting erupted in Jakarta and demonstrators in other major

Indonesian cities called for Suharto's resignation.

156.    On May 21, 1998, with protestors occupying the Indonesian

Parliament, Suharto resigned and was replaced by his Vice President, B.J. Habibie.

157.    Under continuing pressure by the United Nations and Portugal,

Habibie agreed to allow a vote of the residents of East Timor to decide whether they

wished to be independent or to be a separate state in Indonesia with increased

self-determination rights.

158.    On February 16, 1999, one of the Indonesian military leaders in East

Timor, Lieutenant Colonel Sudragat held a meeting in Dili with East Timorese militia

members from 12 regions.  At that meeting he described his plan to "wipe out" pro-

independence supporters following the ballot.  During this period of time, a series of

paramilitary attacks killed hundreds of East Timorese and displaced thousands who had to

flee from their homes.

159.    An important militia leader in East Timor, Goncalves, defected to

Macau on April 18, 1999 and met with an Australian Secret Intelligence Service Officer.

He revealed the names of Indonesia military officers and their plans to wipe out the pro-

independence movement.  Goncalves was the former Commander of the Apodeti forces

which served with Indonesian forces during the covert invasion of East Timor in October

and November 1975.

160.    The East Timorese people voted overwhelmingly in favor of independence in a vote conducted on August 30, 1999.  Immediately thereafter the Indonesian military massacred thousands of East Timorese.  Dili was in ruins and Kofi Annan, the Secretary General of the United Nations, called upon Indonesia to accept United Nation peacekeeper forces in East Timor.  At the same time the United Nations evacuated its Dili compound.

161.    Representatives from ConocoPhillips testified before the Australian Senate Foreign Affairs Defense and Trade References Committee regarding the company's concerns for the events occurring in East Timor.  Participating were Karen Brand, Senior Attorney for Phillips Oil Company Australia and James Godlove, Darwin Area Manager for Phillips Oil Company Australia.  Godlove urged the committee to honor the Indonesian-Australian agreements until a stable government could be put in place in East Timor.  He stated "under the current terms of the treaty and our contracts, if by the end of 2001 we do not have a declaration of commercial discovery and an approved development plan ... we run the risk of losing all of the investments we have made and our rights to develop this field.  This would be a disaster of major proportions."

162.    The United Nations Security Council, on October 25, 1999, established a United Nations Transitional Administration in East Timor ("UNTAET") with a mandate to maintain law and order and facilitate humanitarian assistance.  The United Nations estimated that 90% of the East Timorese had fled their homes during the

massacres being undertaken by Indonesian military and para-military forces following the vote for independence.

163.    ConocoPhillips announced at the same time that it would invest US$1.4 billion to develop the Bayu-Undan gas field, stating, however, that "we need the legal surety of the treaty to remain in place along with its economic and fiscal terms and we are confident it will remain in place."  Phillips estimated at that time that its total investment in the Bayu-Undan gas field would be US$2.5 billion as a result.

164.    However, Mari Alkatiri, the leader of the most significant of the East Timorese political parties and the ultimate Prime Minister for East Timor, in November 1999, stated that his party "would not legitimatize a treaty between a thief and the receiver of stolen goods."

165.    Later, although recognizing that a reassuring letter had been sent to ConocoPhillips by Alkatiri, Ramos Horta and Xanana Gusmao stating that they would honor the treaty arrangements, Alkatiri stated on November 10, 1999:

> "Yes it was sent....  But that doesn't mean we have already
> accepted the treaty as it is.  It's not a problem of oil and gas, it's a
> problem of maritime borders....  I think we have to redefine,
> renegotiate the border later on when East Timor becomes
> independent."

166.    Alkatiri stated in a November 29, 1999 statement that "we still consider the Timor Gap Treaty an illegal treaty.  This is a point of principle.  We are not going to be a successor to an illegal treaty."

167.    Ramos Horta, eventually the Deputy Prime Minister of East Timor and co-recipient of the Nobel Peace Prize, on November 16, 1999, also spoke out against ConocoPhillips.  In particular Ramos Horta was furious that the company had made payments to Indonesia during the September election massacres in East Timor.  Those payments amounted to US$3 million.  Ramos Horta stated:

> I think it's outrageous.  At a minimum, they had an obligation to seize all revenue from oil production after the ballot.  They did not have any authority to make such payments.  Notwithstanding their claim of a treaty, they contracted with Indonesia in disregard of the illegality of the treaty.

168.    ConocoPhillips, in a frantic effort to solidify its relationship with political leaders in East Timor, undertook a continuing series of meetings and discussions with those individuals likely to end up as the principal decision makers in East Timor.

169.    For example, just days after Gusmao was released from prison in Jakarta, he met with ConocoPhillips' Jim Godlove in Indonesia.  Godlove, who at the time was ConocoPhillips' Darwin-area manager, spent months in talks with Gusmao and other potential East Timor leaders in an effort to keep the Bayu-Undan project on track.  At the

time, Mari Alkatiri said, "I know [Godlove] very well."  First introduced in October, Alkatiri and Godlove had regular meetings in East Timor during this period.  Both Godlove and his boss, Steven Brand, who was head of ConocoPhillips' Australian unit, regularly met with Alkatiri and Gusmao to discuss East Timor's participation in the development of oil and gas resources in the Timor Gap.

170.    Australia was also seeking to solidify arrangements to allow for the continuance of its participation in the energy development of the Timor Sea.  UNTAET and Australia signed an Exchange of Notes on February 10, 2000 which provided for an interim agreement to continue the terms of the Timor Gap Treaty previously entered into with Indonesia.  The parties recognized that this was a stop gap device to provide for continuance of the Joint Authority until such time as a newly-elected government in East Timor could consider vouching in the arrangement or undertaking its own course of action.

171.    Thereafter, Australia passed the Australian Timor Gap Treaty (Transitional Arrangements) Act 2000 which formalized recognition that the area covered in the former Timor Gap Treaty would be outside of Indonesia's jurisdiction and that the Timor Gap Treaty would cease to be in force as between Australia and Indonesia.  The Treaty also formally recognized continuing the structure of the Joint Authority, replacing Indonesia with that of the United Nations Transitional Team in East Timor.

172.    During this period, ConocoPhillips sought to increase its overall participation in natural resource development in the Timor Sea.  In late 2000, ConocoPhillips purchased additional interests from the Woodside Petroleum Ltd. Company in order to achieve a 30% participation in the Greater Sunrise natural gas field. At least 20% of that gas field lies within the boundaries of the Zone of Cooperation.

173.    As a result of its acquisition activity, ConocoPhillips ended up in late 2000 with 60% of the venture in the Bayu-Undan hydrocarbon fields and 30% of the participation in the Greater Sunrise gas field.  By far, ConocoPhillips was the predominant oil company to exploit the Timor Gap hydrocarbons.  That preeminence remains today.

174.    On March 15, 2001, ConocoPhillips announced that it intended to import to the United States the natural gas that it extracted from the Timor Sea.  It announced that it had signed a letter of intent with El Paso Corporation that contemplated development of a major project that would deliver liquified natural gas from the Greater Sunrise fields to gas markets in Southern California and Mexico's Baja California peninsula beginning in 2005.  ConocoPhillips estimated that gas production from the Greater Sunrise fields could begin as early as mid-2006.  Gas required to satisfy deliveries prior to that time would be made available from the Bayu-Undan gas field.

**F.**     **Australia Pressures East Timor to Relinquish its Oil Rights and**
          **ConocoPhillips Bribes Prime Minister Alkatiri**

175.    Australia also began to put pressure on the potential leadership in
East Timor to solidify recognition of the arrangements in the Timor Gap that Australia
previously had enjoyed with Indonesia.  Australia began to link cuts in foreign aid
previously promised to East Timor in the event that successful oil negotiations with East
Timor could not be completed.  In October 2000, the Australian government made threats
to cut a 4-year A$75 million aid program for East Timor unless the Timor Gap Treaty was
honored.  The Department of Foreign Affairs and Trade admitted that it was using foreign
aid commitments to coerce continuance of the treaty arrangements in the Timor Sea
previously negotiated with Indonesia.

176.    A number of seriatim approvals by various forms of the new East
Timorese government were required in order to finalize the arrangements between East
Timor and Australia for the exploitation of oil and gas in the Timor Gap.  Each of these
steps in solidifying Australia's and ConocoPhillips' prior arrangements with Indonesia
have provided an opportunity for ConocoPhillips to pay bribes to the East Timorese
leadership to secure the approvals.  In particular, ConocoPhillips has made cash payments
to and for the benefit of Mari Alkatiri in amounts over US$2.5 million in order to secure
his agreement, as the Economic Affairs Minister and then as Prime Minister, to ensure
that East Timor will provide favorable treatment to ConocoPhillips.  The significance of

these payments can best be understood by comparing them to Mr. Alkatiri's current US$450 monthly salary as the Prime Minister.  These cash payments were in U.S. dollars transferred as a result of travel between Australia, the United States and East Timor by Godlove, Brand and even James Mulva, the Chief Executive Officer of ConocoPhillips.

177.   ConocoPhillip's management lied to its shareholders in one early instance of bribery.  The 2000 Annual Report stated that the company, during the year had "donated 13 trucks for agricultural use," purportedly "to help the new nation of East Timor."  Shown in the 2000 Annual Report was a picture of Stephen Brand, "Australasia division president" presenting an additional vehicle--to be used as "a mobile medical clinic"--to three nuns.  In facts, the "trucks" were Toyota SUVs intended to become personal vehicles for the senior political leadership in East Timor.  These SUV's have been so used; they can be seen nightly parked in the driveways of government officials, including the Alkatiri residence.  Mulva and other senior ConocoPhillips management not only intended that these SUV's be a bribe to curry favorable treatment for the company, but also have actually witnessed in trips to East Timor that the vehicles in no way are actually "for agricultural use."  Subsequently, ConocoPhillips has "contributed" a number of other vehicles for the personal benefit of officials in East Timor.

178.   Australia and the United Nation Transitional Administration for East Timor on July 5, 2001 signed a Memorandum of Understanding to agree that the Timor Sea arrangement would govern joint exploitation of the Joint Petroleum Development

Area ("JPDA") (previously Area A of the Zone of Cooperation under the Timor Gap Treaty) pursuant to a newly constituted Joint Authority upon East Timor's independence. The Australian Foreign Minister Alexander Downer signed on behalf of Australia and Mari Alkatiri, then the East Timorese Cabinet Member for Economic Affairs, signed on behalf of the East Timor.

179.    Ahmed Alkatiri is Mari Alkatiri's brother.  During this time and thereafter, Mari Alkatiri sometimes used Ahmed to collect bribes made by foreign companies, including ConocoPhillips, to secure favorable treatment.  In the six-month period preceding the signing of the Memorandum of Understanding in July 2001, Ahmed Alkatiri received $74,000 in U.S. funds, which were then paid into bank accounts in Australia.  Those accounts are with the Australia and New Zealand Bank ("ANZ Bank") facility, one of which is Account Number 0164955606-24866.  Another account used for this purpose at the same bank, but in the name of Mari Alkatiri, is Account Number 0159015376-18038.  Some of the cash banked was deposited at the ANZ branch at 247 Trower Road, Monterey House, Casuarina.  This money was paid by ConocoPhillips in its efforts to solidify approval of the previous arrangements that had been secured from Australia and Indonesia in the Timor Gap.

180.    In August 2001, the United Nations supervised open multi-party elections in East Timor.  The Fretlin party, led by Mari Alkatiri, won the majority of seats in the 88-member constitutional assembly.

181.   The establishment of an independent government in East Timor accelerated the efforts by Australia and ConocoPhillips to solidify and perpetuate the previous agreements that had been entered into with Indonesia.  Much was at stake.  The ConocoPhillips-led consortium has already planned to invest approximately US$6 billion in the overall exploitation of natural resources in the Timor Sea.  Australia, for its part, not only was seeking to secure the natural resources it had sought since the mid-1970's, but was also anticipating that the economic development fostered by this exploitation of natural resources would provide an economic base by which the Northern Territory in Australia could transition into a fully recognized state.

182.   ConocoPhillips had promised Australia that its participation in the Timor Gap would lead to its building a liquid natural gas processing plant in Darwin.  This commitment was estimated to involve investment in the Northern Territory of US$1.5 billion by ConocoPhillips.  The Premier of the Northern Territory, Claire Martin, publicly took the position that this investment and its creation of thousands of jobs in the Northern Territory would be sufficient to end the subsidy-basis on which the Northern Territory had been operating and allow the Northern Territory to become an Australian state.

183.   Australia, as discussed below, negotiated with East Timor to secure natural resource rights that it clearly otherwise would not have had.  The goal at all times was to secure the lion's share of the natural gas and oil present in the Timor Sea area.

Under any application of international law, Australia had no claim over these reserves.

By combining negotiations in the Timor Gap with those pertaining to Greater Sunrise--a

large natural gas reserve of which approximately 20% lies within the Joint Production

Development Area--Australia ultimately sought to secure 70% of the revenues connected

with the identified oil and natural gas reserves in the Timor Sea.  The trade sought to be

imposed by Australia was that it would take only 10% of the revenues derived from the

Bayu-Undan field (over which Australia had no legitimate claim), leaving 90% for East

Timor, if it could secure 80% of the revenues pertaining to Greater Sunrise--an area over

which Australia otherwise had no valid claim under international law.  Because of the

larger projected magnitude of the reserves in Greater Sunrise, Australia, through this ploy,

would end up with 70% of the overall revenues in the Timor Sea.

184.   One of the occasions on which Australia and ConocoPhillips joined

forces to bring economic pressure on East Timor pertained to the projected tax rate that

East Timor sought to impose on ConocoPhillips.  That tax rate was in excess of that

which ConocoPhillips previously had in place with Indonesia.

185.   Jim Mulva, ConocoPhillips' CEO, flew to the Australian capital,

Canberra, on August 21, 2001, to meet with both the Australian Industry Science and

Resources Minister Minchin and with Foreign Minister Downer.  Both Australia and

ConocoPhillips took the position that if East Timor continued to insist on its higher tax

rates, then the development project in the Timor Gap would be discontinued and there would be, as a result, no revenues to benefit East Timor in the near term.

186.    Mulva, on August 22, 2001, announced to the press that he had met with both Downer and Minchin to tell them that the higher tax rates would lead to ConocoPhillips abandoning the project.  He further stated that he informed Australia that there would be no further investment by ConocoPhillips until the terms and conditions of the prior arrangement with Indonesia were restored and that his intention in so informing Australia was to secure Australia's participation in resolving the problem.  Thereafter, Mulva flew to Dili to meet with Mari Alkatiri.  He traveled with Stephen Brand and James Godlove on a ConcoPhillips aircraft, Registration No. N663P, arriving in Dili on August 24, 2001.

187.    Mulva's trip to Dili to attempt to secure the same tax arrangements as previously had been in place with Indonesia took place just before the elections in East Timor.  Mulva met with Alkatiri, who at the time was designated as the Chief Timorese negotiator by both UNTAET and the provisional East Timorese government.  Alkatiri told Mulva in those meetings to wait until after the elections to further discuss the issue.

188.    Around the same time, in early October 2001, Oceanic and Petrotimor delivered to UNTAET a request to honor the concession previously granted to Portugal and expand it to include all areas within the legitimate boundaries of East Timor. Alkatiri, as a direct result of ConocoPhillips' payments, persuaded UNTAET Chief Sergio

Vieira de Mello to issue a "gag order" to all of the UNTAET staff prohibiting them from communicating in any way with any representative from Oceanic or Petrotimor.

189.    After the elections, repeated discussions between ConocoPhillips and Alkatiri took place.  For example, on October 12, 2001 ConocoPhillips officials flew to Dili from Perth on a ConocoPhillips aircraft, Registration No. N663P, later returning to Darwin.  Finally, on December 21, 2001 Brand, President of Phillips Petroleum (91-12) Pty. Ltd., now known as ConocoPhillips (03-12) Pty. Ltd., speaking on behalf of ConocoPhillips and its subsidiaries and co-ventures in the Bayu-Undan field, stated that the East Timor Counsel of Ministers had decided to endorse the Understanding on Tax and Fiscal Package that solidified the tax rates that Phillips previously had in place with Indonesia.

190.    Earlier, at the end of October, Mari Alkatiri and Ahmed Alkatiri, on his brother's behalf, received approximately $44,000 in U.S. funds which ultimately were paid into bank accounts in Australia at the ANZ Bank in Casuarina.  These payments were made by ConocoPhillips in order to influence the decision by East Timor to reduce its tax rates.

191.    Oceanic and Petrotimor, both in a visit and discussions with provisional officials of the East Timorese government and in a public announcement, in early March 2002, offered to fund litigation in the International Court of Justice on behalf of East Timor in order that East Timor could pursue the entirety of its legitimate rights

under international law to the natural resources in the Timor Sea.  After Oceanic and

Petrotimor made this offer, Australia, without public fanfare, withdrew from the

compulsory jurisdiction of the International Court of Justice as to all disputes pertaining

to delimitation of maritime zones.  Alkatiri, at the time, described this action by Australia

as "a lack of confidence in us and an unfriendly act."

      192.    East Timor, on April 14, 2002, formally elected its 88-member

constitutional assembly and the assembly voted to become East Timor's Parliament.  Mari

Alkatiri was designated the Prime Minister, with Gusmao the President.  Mulva,

originating his travel in the United States on a ConocoPhillips aircraft, Registration No.

N663P, visited Dili, departing on April 17, 2002, in the company of Billy Parker, Stephen

Brand and Blair Murphy, with a destination of Sydney, Australia.  East Timor had its

"independence day" on May 20, 2002.  ConocoPhillips paid for the celebrations and

Mulva, ConocoPhillips CEO, traveled to Dili and attended the celebrations.  Mulva,

originating his travel in the United States on a ConocoPhillips aircraft, Registration

No. N667P, arrived in Dili on May 19, 2002 in the company of Blair Murphy, Stephen

Brand and Billy Parker.  Prior to the arrival in Dili, the aircraft stopped in Darwin,

Australia.

      193.    Mulva arranged to have over $2 million in U.S. funds paid to Mari

Alkatiri during Mulva's trip as a bribe for Alkatiri's participation in ensuring that

ConocoPhillips maintained its interests in the Timor Sea on the same terms as it had

previously secured from Australia and Indonesia.  This US$2 million cash payment was then ferried in various amounts to Australia and placed in a bank account in the name of Ahmed Alkatiri, for the benefit of Mari Alkatiri.  Between May and December, 2002, Alkatiri and members of his family and cohorts made over 80 trips from Dili to Darwin for this purpose.  The cash was deposited at the Wespac Bank at 7 Bradshaw Terrace, Casuarina.  In transactions with the Westpac Bank, Ahmed--in an effort to cover-up his actions--used at least four different names:  Ahmad Alkatiri, Ahmad Bin Hamud Alkatiri, Ahmed Alkatiri and Ahmade Hamute Alkatiri.

194.    In addition, in the period between May and July, 2002, additional monies were given to Ahmed and Mari Alkatiri by ConocoPhillips in an amount approximating A$138,000.  These funds, as well, were ultimately transported to Australia for placement in the separate ANZ bank accounts.

195.    Australia was aware of and participated in the suborning of Alkatiri and his cronies.  For example, in November 2002, members of the Fretlin party, which constituted a majority of the 88-member assembly in East Timor, individually went to the Australian embassy to receive US$50,000 payments from ConocoPhillips.  The payments were actually made by Stephen Candotti, a Senior Administration Officer in the Australian Consulate, or an individual purporting to be Stephen Candotti.

196.    Alkatiri, in early October 2002, began to agitate Australia to begin discussions on finalizing the permanent maritime boundaries between East Timor and

Australia and on October 3, 2002, he wrote to John Howard, Prime Minister of Australia, to that effect.  Howard responded on November 3, 2002, stating that Australia would not undertake discussions of permanent maritime boundaries until such time as the Timor Sea treaty was in force and the International Unitization Agreement for the Sunrise gas field has been completed.  As to the Sunrise gas field, Australia is seeking to garner 80% of the revenues.  The disparity between the revenues projected out of Bayu-Undan - - an area as to which Australia was prepared to give up 90% of the revenues to East Timor-- and that of Greater Sunrise results overall in Australia securing 70% of the revenues from the Timor Sea.

      197.    Alkatiri responded to Howard, complaining that Australia never before had conditioned the discussion of permanent maritime boundaries upon East Timor's approval of the International Unitization Agreement, and further stating that "completion of these interim arrangements" is not necessary before boundary talks may begin.  He pointed out in that letter that many of the then currently producing oil fields were not covered by the interim agreements but were within the East Timor seabed entitlement and that these fields were being depleted without East Timor receiving any taxes or royalties from them.  Within this group are Laminaria, Corallina, Buffalo, Challis and Jabiru.

      198.    Subsequently, on November 27, 2002, a ministerial-level meeting was held between Alexander Downer, Australia's Foreign Minister and Alkatiri.  In that

meeting, Downer forcefully contended that East Timor must surrender its claims to Sunrise in order to secure overall agreement as to permanent boundaries between the two countries and that no interim approval would be recognized by Australia until East Timor has conceded the Greater Sunrise oil fields.  Downer made clear that Australia intended to block any receipt of revenues by East Timor until that happened, with Australia obtaining 80% of the revenues from that field.

199.    December 31, 2002 was seen as the deadline for Australia to approve the Timor Sea Treaty between Australia and East Timor covering the Timor Gap area, now denominated as the Joint Petroleum Development Area.   Although the Timor Sea Treaty had earlier been signed by East Timor and Australia on May 21, 2002, that treaty required parliamentary approval by both countries.  The International Unitization Agreement was necessary as a separate agreement between the two countries because the Greater Sunrise gas field straddled the eastern border of the Joint Petroleum Development Area and is thus partially outside the boundaries covered by the Timor Sea Treaty.  The Timor Sea Treaty, signed by the heads of state in May 2002, contemplated that the International Unitization Agreement would be finalized by December 31, 2002.

200.    In December 2002, ConocoPhillips applied further pressure to get the Timor Sea Treaty ratified.  It took the position that it could not proceed with the Darwin LNG plant until such time as the ratification process was complete. ConocoPhillips' Darwin-area Manager Murphy stated at the time "[w]e do want the Timor

Sea Treaty ratified as soon as possible and would rather it not be tied to the Sunrise

Unitization Agreement."  Phillips had already signed contracts to supply the liquid natural

gas obtained from the Bayu-Undan field to Japan's Tokyo Electric Power and Tokyo Gas

beginning in January 2006.  Murphy further stated at the time that the company needed 36

months to build the Darwin facility and that if "the ratification process is strung out too

long, it does jeopardize the Darwin project, and that if ratification "did not come by

December, it needed to be as early as possible after that."  At the same time Dr. Geoffrey

Raby, the First Assistant Secretary, International Organizations and Legal Division with

Australia's Department of Foreign Affairs and Trade, stated:  "[w]e have some interest in

Bayu-Undan, but Australia's bigger interest is demonstrably with the development of

Greater Sunrise.  To do the treaty without having concluded the International Unitization

Agreement for Sunrise would leave us possibly in a situation of less confidence and less

security than at present."

   201. The East Timor Parliament, the leading members of which had

received US$50,000 bribes from ConocoPhillips, on December 17, 2002, ratified the

Timor Sea Treaty, but without agreement on the International Unitization Agreement that

covered the Sunrise oil fields.  ConocoPhillips's Murphy stated at the time that East Timor

would receive US$3 billion from the Bayu-Undan oil field over the next 17 years.

   202. At about this same time, Alkatiri, through his brother Ahmed,

received approximately $54,000 in U.S. funds from ConocoPhillips to secure his approval

and participation in the treaty ratification.  These funds were ultimately deposited in ANZ Bank accounts in the name of Mari and Ahmed Alkatiri.

203.    Thereafter, ConocoPhillips imposed a deadline of March 11, 2003 by which it must have ratification of the Timor Sea Treaty in order to go forward with the construction of a liquid natural gas facility in Darwin.

204.    Alkatiri, on March 4, 2003, wrote to Prime Minister Howard informing him that he has submitted the International Unitization Agreement for approval to the East Timorese Counsel of Ministers.

205.    On March 6, 2003, Alkatiri and Foreign Minister Downer of Australia signed the International Unitization Agreement which apportions 80% of the revenues from Greater Sunrise to Australia - - an allocation estimated at the time to be worth A$40 billion.  Later that day, the Australian Senate ratified the Timor Sea Treaty. During the ratification discussion, the Senate leader of the Green Party in Australia, Robert Brown, accused Prime Minister Howard of blackmailing East Timor.  As a result of his comments, Brown physically was thrown out of the Senate discussions.

206.    The Timor Sea Treaty formally came into effect on April 1, 2003, with the exchange of notes between Australia and East Timor.  The Timor Sea Treaty created a three-tiered regulatory body to govern oil exploration and extraction in the Joint Petroleum Development Area ("JPDA"):  a Designated Authority, a Joint Commission and a Ministerial Council.  The Designated Authority is a separate and distinct non-

governmental business entity, which replaced the former Joint Authority.  In fact, the

Timor Sea Treaty emphasizes the Designated Authority's individual legal status by stating

that it has "juridicial personality and such legal capacities under the law of both Australia

and East Timor as are necessary for the exercise of its powers and the performance of its

functions.  In particular, the Designated Authority shall have the capacity to contract, to

acquire and dispose of movable and immovable property and to institute and be party to

legal proceedings."  The Designated Authority is supervised by the Joint Commission, but

carries out most of the "day-to-day regulation and management of petroleum activities" in

the JDPA, including initiating the bidding process for blocks, recommending to the Joint

Commission which bids should be approved, negotiating and entering into Production

Sharing Contracts with winning petroleum exploration companies, and collecting and

distributing the Designated Authority's share of business profits and dividends.  All

financial transactions are conducted through bank accounts with the Chase Manhattan

Bank in New York, New York.  It is through these accounts that the Designated Authority

conducts its principal financial transactions.

       207.   Shortly after the Timor Sea Treaty ratification, Alkatiri introduced

tax relief legislation before the East Timorese Parliament.  In this legislation, Alkatiri

proposed that East Timor, the poorest country in southeast Asia, reduce the tax rates

being applied to ConocoPhillips.  He did so despite his earlier insistence that much more

draconian rates should apply to ConocoPhillips.  The legislation principally benefits

ConocoPhillips in that it only applies to the Bayu-Undan project and lowers the income tax rate for revenues derived from Bayu-Undan property.  Furthermore, the legislation secured the tax rate for at least 20 years on these favorable terms.  Mulva, in a trip originating out of the United States, traveled to Dili to meet with Alkatiri in the second week of April, 2003.  He flew with William Berry and Blair Murphy on a ConocoPhillips aircraft, Registration No. N667P, departing Dili on April 14, 2003 for Darwin, Australia.  The East Timor Parliament approved the tax legislation on June 5, 2003.

208.    ConocoPhillips then announced on June 15, 2003, that the Designated Authority had approved its gas development plan for Bayu-Undan.  ConocoPhillips stated that it would then proceed with the US$1.5 billion development that included a pipeline from Bayu-Undan to Darwin and the construction of a liquified natural gas plant in Darwin.  Gas production was contemplated to begin in 2004 with deliveries in 2006.  One of the joint venturers to the project, Santos, asserted that this approval by ConocoPhillips would increase the Bayu-Undan revenues by more than US$20 billion.

209.    The agreement on Bayu-Undan, however, did not resolve continuing disputes between Australia and East Timor as to oil and gas fields other than Greater Sunrise and Bayu-Undan.  As a result, East Timor has continued to press for commencement of negotiations concerning establishing permanent sea boundaries so that the rights pertaining to those oil and gas fields can be allocated.  A concern expressed by

East Timor is that Australia's continuing exploitation of these resources without

undertaking meaningful discussions will lead to the depletion of oil and gas before there

is a finalization as to allocation.  Specifically, on November 17, 2003, East Timor asked

Prime Minister Howard to halt Australia's oil and gas production in the disputed oil fields

of Lamanaria, Corallina and Buffalo until the two countries could agree on a maritime

boundary.  Alkatiri stated at that time that:

> Australia has an international legal obligation to exercise
>
> restraint in regard to the exploitation of resources in disputed
>
> maritime areas.  Australia is asking [East Timor] not to exploit
>
> resources unilaterally where the claims overlap, but on the other
>
> hand Australia is exploiting the same resources in overlapping areas.
>
> It is complete double standards.

210.   Then, on December 10, 2003 in a speech in Australia's capital city

Canberra, East Timor's Foreign Minister, Jose Ramos-Horta, stated that "Australia was

acting unlawfully and exploiting oil reserves in the Timor Sea and that Australia aimed to

pump out billions of dollars worth of oil while dragging on the talks for a permanent

maritime boundary."  Ramos-Horta further stated that:  "It is our view that those fields,

Buffalo, Lamanaria-Corallina that have been under Australian licenses, rightfully are part

of East Timor sovereign rights."  He further reported in that speech that US$1.5 billion

had already been paid to Australia from those fields since the mid-90's under licenses for these disputed oil fields.

211.   ConocoPhillips has since October 2001 imported to the United States oil which it derived from the Elang/Kakatua field in the Timor Sea.  In October 2001, Phillips imported 650,000 barrels of oil to Martinez, California from the Elang-Kakatua oil fields in the Timor Gap.  In November 2001, Phillips imported 618,000 barrels of oil to San Francisco, California from the Elang-Kakatua oil fields in the Timor Gap.  In December 2001, Phillips imported 678,000 barrels of oil to San Francisco, California from the Elang-Kakatua oil fields in the Timor Gap.  In January 2002, Phillips imported 650,000 barrels of oil to Seattle, Washington from the Elang-Kakatua oil fields in the Timor Gap.  In April 2002, Phillips imported 648,000 barrels of oil to San Francisco, California from the Elang-Kakatua oil fields in the Timor Gap.  In May 2002, Phillips imported 657,000 barrels of oil to Seattle, Washington from the Elang-Kakatua oil fields in the Timor Gap.  In June 2002, Phillips imported 569,000 barrels of oil to Martinez, California from the Elang-Kakatua oil fields in the Timor Gap.  Also in June 2002, Phillips imported 49,000 barrels of oil to Seattle, Washington from the Elang-Kakatua oil fields in the Timor Gap.  In July 2002, Phillips imported 682,000 barrels of oil to Martinez, California from the Elang-Kakatua oil fields in the Timor Gap.  In August 2002, Phillips imported 63,000 barrels of oil to Martinez, California from the Elang-Kakatua oil fields in the Timor Gap.  In September 2002, Phillips imported

1,300,000 barrels of oil to Martinez, California from the Elang-Kakatua oil fields in the Timor Gap. In October 2002, Phillips imported 652,000 barrels of oil to Martinez, California from the Elang-Kakatua oil fields in the Timor Gap. In November 2002, Phillips imported 641,000 barrels of oil to Martinez, California from the Elang-Kakatua oil fields in the Timor Gap. In December 2002, Phillips imported 636,000 barrels of oil to Martinez, California from the Elang-Kakatua oil fields in the Timor Gap for sale in the United States. In January 2003, Phillips imported 622,000 barrels of oil to Martinez, California from the Elang-Kakatua oil fields in the Timor Gap for sale in the United States. In February 2003, Phillips imported 650,000 barrels of oil to Martinez, California from the Elang-Kakatua oil fields in the Timor Gap for sale in the United States. In March 2003, Phillips imported 631,000 barrels of oil to Martinez, California from the Elang-Kakatua oil fields in the Timor Gap for sale in the United States. In April 2003, Phillips imported 367,000 barrels of crude oil to Eureka, California from the Elang-Kakatua oil fields in the Timor Gap for sale in the United States. In May 2003, Phillips imported 616,000 barrels of oil to Martinez, California from the Elang-Kakatua oil fields in the Timor Gap. In June 2003, Phillips imported 657,000 barrels of oil to Martinez, California from the Elang-Kakatua oil fields in the Timor Gap. In July 2003, Phillips imported 725,000 barrels of oil to Martinez, California from the Elang-Kakatua oil fields in the Timor Gap. In August 2003, Phillips imported 410,000 barrels of foreign crude oil to Eureka, California from the Elang-Kakatua oil fields in the Timor Gap. In

August 2003, Phillips imported 251,000 barrels of oil to Martinez, California from the Elang-Kakatua oil fields in the Timor Gap.

212.    Once the production from the Elang/Kakatua fields began, the Joint Authority established a Special Fund with Chase Manhattan Bank in New York, New York.  Chase Manhattan is insured by the Federal Deposit Insurance Corporation.  The Joint Authority instructed BHP, and then ConocoPhillips, to deposit the proceeds from the sale of the Joint Authority's portion, and later the Designated Authority's portion, of the oil produced from the Elang/Kakatua fields in that Chase Manhattan Bank account.  BHP, and then ConocoPhillips, regularly so deposited the sale proceeds.  Those transactions, which have been documented in the Joint Authority's annual reports, constitute transactions that involve the use of a financial institution engaged in activities that affect interstate or foreign commerce in any way or degree.

213.    ConocoPhillips deposits the proceeds of its sale of oil from the Elang/Kakatua fields in an as yet unidentified domestic financial institution that is insured by the Federal Deposit Insurance Corporation.  ConocoPhillips transfers or causes to be transferred by wire from accounts in the financial institution holding its deposits to the Joint Authority's and/or Designated Authority's accounts at Chase Manhattan Bank in New York, New York.

214.    ConocoPhillips' deposits in the Joint Authority's account in Chase Manhattan Bank and subsequently in the Designated Authority's account in Chase

Manhattan Bank were made with the intent to promote specified unlawful activity. If

ConocoPhillips did not make those payments to the Joint Authority and subsequently to

the Designated Authority for the first tranche oil, then the Joint Authority and

subsequently the Designated Authority would terminate the respective Production

Sharing Contracts and preclude ConocoPhillips from taking and selling any more of the

misappropriated oil (and later natural gas) from the Timor Sea.

215.   On a monthly basis, the Joint Authority and subsequently the

Designated Authority distributed the funds deposited in their bank accounts at Chase

Manhattan Bank in New York to the bank accounts nominated by each of the

Contracting States.

216.   The Joint Authority's and Designated Authority's deposits in the

bank accounts designated by the Contracting States were made with intent to promote

specified unlawful activity. By making payments to the Contracting States, the Joint

Authority and Designated Authority ensured that the Contracting States would continue

to reap financial benefits from ConocoPhillips' exportation of misappropriated oil (and

later natural gas), that the Contracting States would continue to recognize

ConocoPhillips' Production Sharing Contract, and that ConocoPhillips would continue

exporting misappropriated oil (and later natural gas) from the Timor Sea.

217.   Indonesia designated Pertamina as the entity responsible for

receiving its share of funds that were distributed by the Joint Authority. Accordingly,

Indonesia nominated a bank account in the United States that had been set up by Pertamina as the recipient of the funds that were distributed by the Joint Authority. Pertamina subsequently transferred the funds in this account to other accounts in the United States and abroad.

218.   Pertamina's transfers of funds were made with intent to promote specified unlawful activity by ensuring that ConocoPhillips' Production Sharing Contract would continue to be honored, that ConocoPhillips would continue exporting misappropriated oil (and later natural gas) from the Timor Sea and that Indonesia and Pertamina would continue to reap financial benefits from ConocoPhillips' exportation of misappropriated oil (and later natural gas).

219.   Both the oil (and later extracted natural gas) and the revenue generated from the sale of those products from the Timor Sea constitute proceeds of specified unlawful activity.  Specified unlawful activity includes, but is not limited to, the predicate acts and other claims including:  murder, robbery, extortion, destruction of property by means of explosive or fire, a crime of violence, fraud, or any scheme to defraud, bribery of a public official, an offense with respect to which the United States would be obligated by a multilateral treaty, either to extradite the alleged offender or to submit the case for prosecution, if the offender were found within the territory of the United States.

220.    The financial transactions engaged in by ConocoPhillips, the Joint Authority, the Designated Authority and Pertamina that result from the sale of the oil were and are made with the intent to promote specified unlawful activity because only by getting money for the oil does ConocoPhillips, the Joint Authority, the Designated Authority and Pertamina realize the benefit from the misappropriated oil and natural gas.

221.    ConocoPhillips, the Joint Authority, the Designated Authority and Pertamina knew, at the time that they participated in or attempted to participate in the foregoing financial transactions that the funds at issue represented the proceeds of some form of an activity that constituted a felony under State, Federal, or foreign law.

222.    In addition to the foregoing transactions being made and continuing to be made with the intent to promote specified unlawful activity, the foregoing transactions were made with the intent to intent to evade taxes or commit tax fraud; with the intent to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity; and/or with the intent to avoid a transaction reporting requirement under State or Federal law.

223.    Defendants currently, and at all times mentioned herein, engaged in a concerted effort to conceal from the public, shareholders and Plaintiffs each and every act of tortious, fraudulent or criminal conduct alleged herein.  Additional facts relating to the concealed tortious, fraudulent and criminal conduct are exclusively in the possession,

custody or control of defendants or third-parties affiliated with or employed by the

defendants.

224.    The value of the oil and natural gas reserves in the area of the Timor

Sea subject to the concession to Plaintiffs granted by Portugal exceeds US$50 billion.

The Plaintiffs' projected profit over time from this property is in excess US$10.5 billion.


FIRST CLAIM

RACKETEER INFLUENCED AND CORRUPT

ORGANIZATIONS ACT

(18 U.S.C. §§ 1962(c) and 1964(c))

(Against All Defendants)

225.    Plaintiffs reallege and incorporate by reference each and every

allegation in Paragraphs 1-212.

226.    From on or about 1975, continuing through the filing of this

Complaint, defendants were persons and associated-in-fact with an enterprise engaging

in, and the activities of which affect, interstate and foreign commerce.  This enterprise is

made up of the ConocoPhillips Group, the Joint Authority, the Designated Authority, and

Pertamina Group.

227.    The defendants, and each of them, for the purpose of executing and

attempting to execute the scheme to improperly gain control of and exploit the Plaintiffs'

property in the 14.8 million acre concession area in the Timor Sea and extract and import said property to the United States, by means of tortious, fraudulent and criminal conduct, did and do unlawfully, willfully and knowingly conduct and participate, directly and indirectly, in the conduct of said enterprise's affairs through a pattern of racketeering activity. Their actions include multiple, related acts in violation of: (1) Interstate and Foreign Travel to Aid Racketeering, 18 U.S.C. § 1952; (2) Transportation of Stolen Goods and Receipt of Stolen Goods, 18 U.S.C. §§ 2314 and 2315; (3) Money Laundering, 18 U.S.C. § 1956; (4) Engaging in Monetary Transactions in Proceeds from Specified Unlawful Activities, 18 U.S.C. § 1957; (5) the Hobbs Act, 18 U.S.C. § 1951; and (6) Embezzlement, 18 U.S.C. § 659.

228.   The enterprise as described herein is at all relevant times a continuing enterprise because, among obvious reasons, it is designed to and did unlawfully gain control of and is currently extracting Plaintiffs' property from the 14.8 million acre concession area in the Timor Sea and is currently importing and plans to continue importing this stolen property to the United States.  The conduct of the enterprise continues through the date of this Complaint and is ongoing by virtue of defendants' continued exploitation of the Plaintiffs' property in the Timor Sea, all to the detriment of Plaintiffs.

229.   The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat of

continuing criminal activity.  Such activity consists of multiple acts of racketeering by each defendant herein, is interrelated, not isolated and is perpetrated for the same or similar purposes by the same persons. Such activity extends over a substantial period of time, up to and beyond the date of this Complaint. Such activities occurred after the effective date of 18 U.S.C. §§ 1961 et seq., and the last such act occurred within 10 years after the commission of a prior act of racketeering activity. These racketeering activities included repeated acts of:

(a)    Interstate and Foreign Travel in Aid of Racketeering

Enterprises: On or about the dates indicated in the paragraphs incorporated below, defendants and their employees and/or agents acting on their behalf, aided and abetted by each other, and the remaining defendants, traveled in interstate or foreign commerce or used the mail or any facility in interstate or foreign commerce, with intent to do so thereafter distributed or attempted to distribute the proceeds of any unlawful activity, committed or attempted commit any crime of violence to further any unlawful activity; or promoted, managed, established, carried on, or facilitated the promotion, management, establishment, or carrying on, of any unlawful activity or attempted to do so.  Said unlawful activity included, but was not limited to, extortion and/or bribery in violation of the laws of the United States, including but not limited to violations of the Foreign Corrupt Practices Act, 15 U.S.C. §§78dd-1 to -3, and in violation of 18 U.S.C. § 1952 and

18 U.S.C. § 2, as described in Paragraphs 3, 6-8, 10, 57-66, 106-122, 163-169, 176-180, 184-190, 192-195, 200-204 and 207 of this Complaint.

(b)      Interstate or Foreign Transportation of Stolen Goods: On or about the dates indicated in the paragraphs incorporated below, defendants aided and abetted by each other, and the remaining defendants, having devised or intending to devise a scheme or artifice to defraud Plaintiffs by means of false or fraudulent pretenses, representations or promises, transported or caused to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud, property of plaintiffs, having a value of $5,000 or more, in violation of 18 U.S.C. § 2314 and 18 U.S.C. § 2, as described in Paragraphs 3, 6-8, 10, 45, 49, 57-72, 132-146, 206 and 211-222 of this Complaint.

(c)      Receipt of Stolen Goods: On or about the dates indicated in the paragraphs incorporated below, defendants aided and abetted by each other, and the remaining defendants, did receive, possess, conceal, store or dispose of goods of the plaintiffs, which had crossed a State or United States boundary after being stolen, unlawfully converted or taken, knowing the same to have been stolen, unlawfully converted, or taken.  Such goods include property having a value of $5,000 or more. Such actions are in violation of 18 U.S.C. § 2315 and 18 U.S.C. § 2, as described in Paragraphs 3, 6-8, 10, 45, 49, 57-72, 132-146, 206 and 211-222 of this Complaint.

(d)     <u>Money Laundering--Transaction</u>:  On or about the dates indicated in the paragraphs incorporated below, defendants, aided and abetted by each other, and the remaining defendants, with knowledge that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted or attempted to conduct a financial transaction that, in fact, involved or would have involved the proceeds of specified unlawful activity.  Defendants did so with the intent to promote or to attempt to promote the carrying on of specified unlawful activity; with intent to engage or to attempt to engage in conduct constituting tax fraud or tax evasion; or knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or to avoid a transaction reporting requirement under State or Federal law.  Such actions are in violation of 18 U.S.C. § 1956 and 18 U.S.C. § 2, as described in Paragraphs 10, 45, 49, 106-131, 206 and 211-222 of this Complaint.

(e)     <u>Money Laundering - Transportation</u>:  On or about the dates indicated in the paragraphs incorporated below, defendants, aided and abetted by each other, and the remaining defendants, transported, transmitted, transferred or attempted to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States with the intent to promote or to attempt to promote the carrying on of specified unlawful activity; or knowing that the monetary

instrument or funds involved in the transportation, transmission, or transfer or attempted transportation, transmission or transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or to avoid a transaction reporting requirement under State or Federal law.  Such actions are in violation of 18 U.S.C. § 1956 and 18 U.S.C. § 2, as described in Paragraphs 10, 45, 49, 106-131, 206 and 211-222 of this Complaint.

(f)     Monetary Transactions in Proceeds from Specified Unlawful Activities:  On or about the dates indicated in the paragraphs incorporated below, defendants, aided and abetted by each other, and the remaining defendants, knowingly engaged or attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000, which property was or would have been derived from specified unlawful activity.  The Defendants committed or attempted to commit that offense both in the United States (or in any special maritime and territorial jurisdiction of the United States) and with respect to those defendants that are United States persons outside the United States (or any special jurisdiction).  Such actions are in violation of 18 U.S.C. § 1957 and 18 U.S.C. § 2, as described in Paragraphs  10, 45, 49, 106-131, 206 and 211-222 of this Complaint.

(g)     <u>Violation of the Hobbs Act</u>:  On or about the dates indicated in the paragraphs incorporated below, defendants, aided and abetted by each other, and the remaining defendants, did obstruct, delay, or affected commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempting or conspiring so to do, or committed or threatened physical violence to any person or property in furtherance of a plan or purpose to do anything in violation the Hobbs Act, including but not limited to, the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession; or the obtaining of property from another, without his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.   Such actions are in violation of 18 U.S.C. § 1951 and 18 U.S.C. § 2, as described in Paragraphs 3, 6-8, 10, 45, 49, 57-72, 98-99, 132-146, 206 and 211-222 of this Complaint.

(h)     <u>Embezzlement</u>:  On or about the dates indicated in the paragraphs incorporated below, defendants, aided and abetted by each other, and the remaining defendants, did (a) embezzle, steal, or unlawfully took, carried away, obtained from any pipeline system, vehicle, or from any tank or storage facility, station, station house, platform or depot or from any vessel, or wharf, with intent to convert to its own use, any goods or chattels moving as or which are a part of or which constitute an

interstate or foreign shipment of freight, express, or other property; and (b) bought or

received or has in its possession any such goods or chattels, knowing the same to have

been embezzled or stolen.  Such actions are in violation of 18 U.S.C. § 659 and 18 U.S.C.

§ 2, as described in Paragraphs 3, 6-8, 10, 45, 49, 57-72, 132-146, 206 and 211-222 of

this Complaint.

230.    The persons alleged herein to have violated 18 U.S.C. § 1962(c) are

separate from, though employed by or associated with, the ConocoPhillips Group, the

Joint Authority, the Designated Authority, and the Pertamina Group.

231.    Each defendant had a role in the racketeering activity that was

distinct from the undertaking of those acting on its behalf.  Each defendant also attempted

to benefit, and did benefit, from the activity of their employees and agents alleged herein,

and thus were not passive victims of racketeering activity, but active perpetrators.

232.    Plaintiffs, and each of them, have been injured in their business or

property as a direct and proximate result of defendants' violations of 18 U.S.C. § 1962(c),

including injury by reason of the predicate acts constituting the pattern of racketeering

activity.

233.    Oceanic has been so injured, at a minimum, by the loss of the

valuable business, rights and property it had a result of the concession granted to

plaintiffs by the Government of Portugal.  Oceanic has also been injured in its valuable

business and property by the actions of defendants in unlawfully preventing and hindering

Oceanic from participating in the concession area, and conducting business with the relevant controlling authorities.

234.    Petrotimor has been so injured, <u>inter</u> <u>alia</u>, by the loss of the valuable business, rights and property it had in the concession granted to plaintiffs by the Government of Portugal.

235.    As a result of the violations of 18 U.S.C. § 1962(c) by members of the ConocoPhillips Group, the Joint Authority, the Designated Authority, and the Pertamina Group, plaintiffs have suffered substantial damages in an amount to be proved at trial.

236.    Pursuant to 18 U.S.C. § 1964(c), plaintiffs are entitled to recover treble their general and special compensatory damages, plus interest, costs and attorneys, fees, incurred by reason of defendants' violations of 18 U.S.C. § 1962(c).


SECOND CLAIM

<u>CONSPIRACY TO VIOLATE RACKETEER INFLUENCED</u>

<u>AND CORRUPT ORGANIZATIONS ACT</u>

(18 U.S.C. §§ 1962(d) and 1964(c))

(Against All Defendants)

237.    Plaintiffs reallege and incorporate by reference each and every allegation in Paragraphs 1 through 222 as if fully set forth herein.

238. From on or about 1975, and continuing through the time of filing this Complaint, defendants willfully, knowingly and unlawfully, did conspire, combine, confederate and agree together, and with various other persons whose names are both known and unknown, to violate 18 U.S.C. § 1962(c).

239. These defendants were and are associated-in-fact with an enterprise engaged in, and the activities of which affect, interstate and foreign commerce. Specifically, the ConocoPhillips Group, the Joint Authority, the Designated Authority, and the Pertamina Group, constituting a group of entities associated-in-fact, did unlawfully, willfully and knowingly participate in and conduct, directly and indirectly, said enterprise's affairs through a pattern of racketeering activity.

240. The pattern of racketeering activity, as defined by 13 U.S.C. §§ 1961(1) and (5) included:

(a) Acts of Interstate and Foreign Travel to Aid Racketeering, 18 U.S.C. § 1952 as described in Paragraphs 3, 6-8, 10, 57-66, 106-122, 163-169, 176-180, 184-190, 192-195, 200-204 and 207 of the Complaint;

(b) Acts of Transportation of Stolen Goods and Receipt of Stolen Goods, 18 U.S.C. §§ 2314 and 2315, as described in Paragraphs 3, 6-8, 10, 45, 49, 57-72, 132-146, 206 and 211-222 of the Complaint;

(c) Acts of Money Laundering, 18 U.S.C. § 1956, as described in Paragraphs 10, 45, 49, 106-131, 206 and 211-222 of the Complaint;

(d)     Acts of Engaging in Monetary Transactions in Proceeds from Specified Unlawful Activities, 18 U.S.C. § 1957, as described in Paragraphs 10, 45, 49, 106-131, 206 and 211-222 of the Complaint.

(e)     Acts in violation of the Hobbs Act, 18 U.S.C. § 1951, as described in Paragraphs 3, 6-8, 10, 45, 49, 57-72, 98-99, 132-146, 206 and 211-222 of the Complaint;

(f)     Acts of Embezzlement, 18 U.S.C. § 659, as described in Paragraphs 3, 6-8, 10, 45, 49, 57-66, 132-146, 206 and 211-222 of the Complaint.

241.    Defendants, and each of them, conspired and schemed to improperly gain control of and exploit the Plaintiffs' property in the 14.8 million acres concession area in the Timor Sea, and extract and import said property to the United States by means of tortious, fraudulent and criminal conduct, as more fully set forth in paragraphs 3, 6-8, 10, 45, 49, 57-72, 98-99, 106-143, 163-169, 176-180, 184-190, 192-193, 200-207 and 211-222.

242.    In furtherance of this unlawful conspiracy, and to effect its objectives, defendants and various co-conspirators committed numerous overt acts, including but not limited to those set forth in paragraphs  3, 6-8, 10, 45, 49, 57-72, 98-99, 106-143, 163-169, 176-180, 184-190, 192-193, 200-207 and 211-222.

243.    Plaintiffs have been injured in their business or property by reasons of defendants' violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering injury.

244.    As a result of the conspiracies between and among all defendants to violate 18 U.S.C. § 1962(c), plaintiffs have suffered substantial damages, in an amount to be proved at trial.

245.    Pursuant to 18 U.S.C. § 1964(c), plaintiffs are entitled to recover treble their general and special compensatory damages, plus interest, costs and attorneys' fees, by reason of defendants' violation of 18 U.S.C. § 1962(d).

THIRD CLAIM

<u>VIOLATION OF THE ROBINSON-PATMAN ACT</u>

15 U.S.C. §§  13(c), 15

(Against the ConocoPhillips Defendants)

246.    Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 231 above, as though set forth at length herein.

247.    The ConocoPhillips defendants are engaged in the business of exploring for and extracting oil and natural gas.  Oceanic and Petrotimor are also engaged in the business of exploring for and extracting oil and natural gas.

248.   The ConocoPhillips defendants are engaged in commerce.  In the course of commerce the ConocoPhillips defendants provided items of value as a commission, brokerage, or other compensation to Indonesia, Pertamina, East Timor, and/or Mari Alkatiri or their respective agents, representatives or other intermediaries in connection with the sale or purchase of goods, wares or merchandise.  At the time of such transaction, the person receiving the value was subject to the direct or indirect control of Indonesia, Pertamina, East Timor and/or Mari Alkatiri.

249.   The ConocoPhillips defendants did not provide these items of value to Indonesia, Pertanmina, East Timor, and/or Mari Alkitiri or their respective agents, representatives or other intermediaries for services rendered in connection with the sale or purchase of goods, wares, or merchandise.  Rather, ConocoPhillips provided these items of value to gain a competitive advantage over Plaintiffs.  As a result of ConocoPhillips defendants' improper conduct, Plaintiffs had no meaningful opportunity to obtain contracts with the named entities or even to meaningfully communicate with them in pursuit of such contracts.  By reason of the ConocoPhillips defendants' improper conduct, Plaintiffs were deprived of any opportunity to recognize their interest and property rights in the petroleum resources in the Timor Sea.

250.   As a result of the ConocoPhillips defendants' improper conduct, Plaintiffs were damaged in an amount to be proven at trial.

FOURTH CLAIM

<u>VIOLATION OF THE LANHAM ACT</u>

(15 U.S.C. § 1126)

(Against All Defendants)

251.    Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 235 above, as though set forth at length herein.

252.    Australia, Indonesia, Portugal and the United States are each signatories to the Paris Convention for the Protection of Industrial Property (the "Paris Convention" ).

253.    Plaintiff Petrotimor is a national of Portugal.  Plaintiff Oceanic is a national of the United States.

254.    The Paris Convention affords protection to nationals of signatory states against acts of unfair competition, including acts of competition contrary to honest practices in industrial and commercial matters.

255.    Defendants engaged in acts of competition contrary to honest practices in industrial and commercial matters, including stealing trade secrets, engaging in fraudulent conduct and committing multiple acts of conspiracy within the United States. Each of these acts violates the Paris Convention's prohibitions against unfair competition.

256.     Under 15 U.S.C. § 1126(h), plaintiff Petrotimor is entitled to bring suit against defendants, and invoke the remedies of the Lanham Act, for defendants' violations of the Paris Convention.

257.     Under 15 U.S.C. § 1126(i), plaintiff Oceanic is entitled to bring suit against defendants, and invoke the remedies of the Lanham Act, for defendants' violations of the Paris Convention.

258.     As a result of defendants' acts of unfair competition in violation of the Paris Convention, defendants have been unjustly enriched and plaintiffs have sustained losses and plaintiffs have been compelled to file suit.

259.     Defendants' conduct was malicious, willful, fraudulent and deliberate.

260.     Pursuant to 15 U.S.C. § 1126(h) and 15 U.S.C. § 1117, plaintiffs are entitled to recover all damages sustained as a result of defendants' unfair competition, including (1) defendants' profits, (2) plaintiffs' losses, (3) the costs of suit, and (4) reasonable attorney's fees.

FIFTH CLAIM

<u>MISAPPROPRIATION OF TRADE SECRETS</u>

(Against All Defendants except the Joint Authority and the Designated Authority)

261.    Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 245 above, as though set forth at length herein.

262.    Plaintiffs' highly confidential and proprietary exploration and seismic data relating to the oil and natural gas resources in the Timor Sea (the "Misappropriated Information") gave Plaintiffs a significant competitive advantage over their existing and would-be competitors, including Defendants.  This advantage would be lost if the Misappropriated Information became known to Plaintiffs' competitors.

263.    Plaintiffs made reasonable efforts under the circumstances to maintain the confidentiality of the Misappropriated Information.

264.    Plaintiffs' Misappropriated Information derives independent economic value from not being generally known to the public or to other persons who can obtain economic benefit from their disclosure.

265.    Defendants had knowledge of, access to and possession of Plaintiffs' Misappropriated Information.

266.    Defendants were under a continuing duty both to keep Plaintiffs' Misappropriated Information confidential, and not to use, explain, or divulge such information other than for the benefit of Plaintiffs and with Plaintiffs' authorization.

267.    Upon information and belief, Plaintiffs allege that Defendants have used and disclosed Plaintiffs' Misappropriated Information without Plaintiffs' consent and without regard to Plaintiffs' rights, and without compensation, permission, or licenses for the benefit of themselves and others.

268.    Defendants' conduct was, is, and remains willful and wanton, and was taken with blatant disregard for Plaintiffs' valid and enforceable rights.

269.    As a direct result of the Defendants' unauthorized misappropriation of the Misappropriated Information, Plaintiffs have been damaged in an amount to be proven at trial.

270.    Because the Misappropriated Information was misappropriated willfully and maliciously, Plaintiffs are entitled to an award of reasonable attorney's fees incurred in the prosecution of this claim and exemplary damages not to exceed twice the amount of damages awarded at trial.

SIXTH CLAIM

INTENTIONAL INTERFERENCE WITH CONTRACT

(Against All Defendants)

271.    Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 255 above, as though fully set forth at length herein.

272.    The Concession from Portugal is a valid contract.  That Concession vested in Plaintiffs property rights in the oil and natural gas in the concession area under the Timor Sea.  The Concession also granted to Plaintiffs the exclusive right to explore for and exploit petroleum resources in the Timor Gap.  All Defendants knew of the existence of the Agreement.  With knowledge of the Agreement, Defendants intentionally engaged in acts designed to induce Plaintiffs and/or Portugal to breach the Agreement and/or to disrupt the contractual relationship between Plaintiffs and Portugal.

273.    By intentionally interfering with and disrupting the contractual relationship between Plaintiffs and Portugal, and by inducing Plaintiffs and/or Portugal to breach the Agreement, Defendants' conduct caused damages to Plaintiffs in an amount to be established at trial.

SEVENTH CLAIM

<u>INTENTIONAL INTERFERENCE WITH</u>

<u>PROSPECTIVE ECONOMIC ADVANTAGE</u>

(Against All Defendants)

274.   Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 258 above, as though set forth at length herein.

275.   Plaintiffs had, during the time period covered in this Complaint both (a) a valid business relationship or expectancy between Plaintiffs, on the one hand, and Portugal, on the other hand; and (b) a later valid business relationship or expectancy between Plaintiffs, on the one hand, and the various entities governing East Timor, on the other hand, relating to the exploration for and exploitation of the petroleum resources in the Timor Sea.

276.   Defendants, and each of them, knew of the existence of a valid business relationship or expectancy between Plaintiffs, on the one hand, and Portugal, on the other hand, and later of a valid business relationship or expectancy between Plaintiffs, on the one hand, and the various entities governing East Timor, on the other hand.

277.   Defendants, and each of them, intentionally interfered with Plaintiffs' valid business relationships or expectancies with Portugal, and later East Timor, which interference cause a breach, termination or conclusion of that relationship or expectancy.

278.    As a direct and proximate result of Defendants' intentional interference with those relationships or expectancies, Plaintiffs suffered damages in an amount to be proven at trial.

EIGHTH CLAIM

CONVERSION

(Against All Defendants)

279.    Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 263 above, as though set forth at length herein.

280.    The Misappropriated Information and Plaintiffs' oil and natural gas in the concession area of the Timor Sea (the "Converted Property") constitute valuable property owned by Plaintiffs.

281.    Defendants have substantially interfered with Plaintiffs' right of possession to the Converted Property by improperly retaining it in their possession, by using the Converted Property for the benefit of the Defendants, by disclosing and distributing the Converted Property to unknown third parties, and by selling the Converted Property to unknown third parties.

282.    Defendants' have intentionally, knowingly and without justification interfered with Plaintiffs' right of possession to the Converted Property.

04163/581331.4                          -100-

283.    By reason of the foregoing, Defendants have converted Plaintiffs' valuable property.

284.    As a direct result of Defendants' intentional interference with Plaintiffs' Converted Property, Plaintiffs have suffered significant damages in an amount to be determined at trial.


NINTH CLAIM

UNJUST ENRICHMENT

(Against all Defendants)

285.    Plaintiffs repeat, reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 269, above, as though set forth at length herein.

286.    The conduct of Defendants has secured to each Defendant profits and value, which unjustly enriches Defendants to the detriment of Plaintiffs.  Plaintiffs hereby request the disgorgement of all profits and value unjustly earned or retained by Defendants.

TENTH CLAIM

UNFAIR COMPETITION

(Against All Defendants)

287.    Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 271, above, as though set forth at length herein.

288.    Defendants' illegal, unfair and fraudulent conduct interfered and continues to interfere with Plaintiffs' ability to compete.

289.    Defendants' acts complained of herein have damaged Plaintiffs. Plaintiffs are entitled to an award of (i) its damages; (ii) an accounting of Defendants' profits; and (iii) the award of Defendants' unjust profits and Plaintiffs' lost profits.

290.    The aforementioned acts of Defendants were committed with fraud, oppression and malice.  Plaintiffs are therefore entitled to punitive damages.

**PRAYER**

WHEREFORE, Plaintiffs pray for judgment against all Defendants and Does 1-50 jointly and severally, as follows:

291.    For all damages permitted by the common law, contract or statute in an amount to be determined at trial, but believed to be not less than US$10.5 billion dollars ($10,500,000,000);

292.   For treble damages pursuant to 18 U.S.C. § 1964(c);

293.   For treble damages pursuant to 15 U.S.C. § 15;

294.   For double damages pursuant to D.C. Code § 36-403;

295.   For all punitive and exemplary damages to which Plaintiffs may be entitled to under applicable law or statute;

296.   For disgorgement of all improperly obtained revenue;

297.   For a constructive trust with respect to all improper revenue or other property improperly possessed or controlled by any defendant or any agent of any defendant;

298.   For further damages according to proof;

299.   For pre-judgment and post-judgment interest;

300.   For any and all costs of suit herein incurred, including, but not limited to, attorneys' fees; and

301.   For such other and further relief that the Court may deem just and proper.

Respectfully submitted this 26th day of May, 2004.

By_____/s/_____

Dale H. Oliver (D.C. Bar #166975)
Jon D. Corey (admitted *pro hac vice*)
James J. Webster (D.C. Bar #481627)
QUINN EMANUEL URQUHART
OLIVER & HEDGES LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017
Phone: (213) 624-7707
Fax: (213) 624-0643

Attorneys for Plaintiffs
Petrotimor Companhia de Petroleos,
S.A.R.L. and Oceanic Exploration
Company

By_____/s/_____

 Robert E. Scully, Jr. (D.C. Bar #340828)
REES, BROOME & DIAZ, P.C.
8133 Leesburg Pike, Ninth Floor
Vienna, Virginia  22182
Phone: (703) 790-1911
Fax: (703) 848-2530

<u>OF COUNSEL</u>

Robert J. Becher
Ellen Y. Yang
Sarah E. Oliver
 QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
 865 South Figueroa Street, 10th Floor
 Los Angeles, California  90071
 Phone: (213) 624-7707
 Fax: (213) 624-0643

Paddy Jones
 Barrister
 Level 15
 Wardell Chambers
 39 Martin Place
 Sydney NSW 2000
 Phone: 61-2-9221-3216
 Fax:  61-2-9235-3931

Mark O'Brien
GILBERT & TOBIN, Solicitors
2 Park Street
Sydney, Australia 2000
Phone: 61-2-9263-4000
Fax: 61-2-9235-3931